Casey, C. J.,
delivered the opinion of the Court.
The claimant is seeking in this case to recover from the United States the sum of thirty thousand dollars, upon the following bills of exchange:
$5,000. ' Washington, November 28, 1859.
Ten months after date, for value received, pay to our own order, at the Bank of the Republic, New York city, five thousand dollars, and charge to account of our contracts for supplies for the army in Utah.
RUSSELL, MAJORS & WADDELL.
Hon. John B. Floyd, Secretary of War.
Indorsement. — “Russell, Majors & Waddell.”

Acceptance.

E. L.] War Department, November 28, 1859.
Accepted.
JOHN B. FLOYD, Secretary of War.
$10,000. Washington Oity, May 8, 1860.
Six months after date, pay to our own order ten thousand dollars, for value received, at the Bank of the Republic, New York city, and charge to account of our transportation contract of the 12th of April, 1860.
RUSSELL. MAJORS & WADDELL.
Hon. John B. Floyd, Secretary of War.
Indorsement. — “Russell, Majors & Waddell.”

Acceptance.

No. 8.] War Department, May 8,1860.
Accepted.
JOHN B. FLOYD, Secretary of War.
$15,000. Washington City, August 17, 1860.
Six months after date, pay to our own order, at the Bank of the Republic, New York, fifteen thousand dollars, for value received, and charge to account of our transportation contract of the 12th day of April, 1860.
RUSSELL, MAJORS & WADDELL.
Hon. John B. Floyd, Secretary of War,
Indorsement. — “ Russell, Majors & Waddell.”

*272
Acceptance.

No. 68 1 War Department, August 22, 1860.
Accepted.
JOHN B. FLOYD, Secretary of War.
The petition of the claimant sets forth that “the said Thomas W. Peirce avers that the said John B. Floyd, as Secretary of the War Department, and in behalf of the United States, had authority to accept the above-named drafts or bill's of exchange, and that in accepting all and every the said bills he acted in his official capacity and in behalf of the said United States. And the said Thomas W. Peirce avers that the said Floyd, in behalf of the United States as such Secretary of War, was authorized to accept drafts or. bills of exchange of such and the like tenor and effect as the bills aforesaid, and that the said Thomas W. Peirce, relying upon the apparent, as well as upon the actual, authority of the said Secretary of the War Department to make such acceptances, 'and upon the fact of his acceptance of the bills, became the holder and owner of the bills of exchange herein before set forth and described. The said Peirce also avers that he became such holder and owner, in a regular course of business, o.f each and every the above-described bills, before they severally matured.”
To this petition the solicitors on the part of the United States demurred. The cause was heard at October term, 1863, on'that demurrer. That wo might have the case before us on all its facts and circumstances, we overruled the demurrer pro forma, and without prejudice to either party.
The claimant now presents'the testimony of Richard Smith/ cashier of the Bank of the Metropolis, at Washington, D. 0., who states that he had been connected with various banks, in different capacities, for nearly sixty years at the capital. He testifies : “ It was the practice of the government to receive bills of exchange drawn upon it by contractors or subordinate officers. It was a common practice by the Secretary of War, and the heads of departments, to accept such bills, but I cannot specify at the present time particular instances without reference to my files, but with such references I could, no doubt, do so, if my time and health permitted. Extensive operations passed through my hands in the Bank of Columbia, during the war of 1812, including acceptances of the Secretary of War.”
He says further : “I conducted the Bank of Columbia in the Treasury Department from March, 1811, to March, 1817. During that *273 period tlie number of acceptances by the Secretary of War were many in number, and large in amount.”
“ In later periods cases have occurred in which the Bank of the Metropolis was concerned.
“And many cases occurred in the Branch Bank of the United States of acceptances of the Post Office Department. Judge McLean was Postmaster General and director in the Branch Bank of the United States, and he recommended to the bank to take those acceptances as the best business they could do for the bank, and the bank ■did take them to a very large amount, and I never knew an instance where one of them was protested or payment contested.
“It was very much the practice for the Secretary of War, Calhoun, under the direction of the President of the United States, Mr. Monroe, to accept bills of Richard M. Johnson and others, contractors for Yellowstone River expedition, and to make advances and accept bills to facilitate that expedition; and many such bills passed through the Branch Bank of the United States.”
Ho also presents the testimony of George W. Riggs, esq., an eminent private banker at the city of Washington since 1S40. The material part of his testimony is as follows :
“I have been engaged in the business of banking in Washington since 1S40 up to the present time, except an intermission between the latter part of 1848 and early in 1854.
“ In the early part of the above period, that is previous to 1848, I had knowledge of bills of exchange being accustomed to be drawn on the Secretary of the Navy by pursers or navy agents, and such bills being accepted, on presentation, by the Secretary. They were drawn in the common form of bills of exchange payable at a certain time after sight. These bills would come to us from banking-houses in New York, to which the bills came through commercial channels. In case these bills were not paid at maturity, it was our practice to protest them. We have had cases which were protested because there was no appropriation for paying them, and in which they were afterwards paid on appropriation being made.
“ In the second period, that is from 1854 to 1863, it has been usual to present such bills to the Secretary of the Navy and take a verbal acceptance. In such cases of verbal acceptance we of course did not protest the bill, but in case of non-payment we protested the bill for non-payment.
“ Protests of such bills were more frequent prior to the change in *274 the commencement of the fiscal year than now, by reason of the appropriations running out at an earlier period.
“ My experience in regard to post office acceptances lias reference to the former of the aforesaid periods, during which time it was customary to draw drafts on the department, which, in order to facilitate the contractors in the performance of their contracts, were registered at the department on account of the contracts, and we were in the-habit of cashing such drafts.
“ Our banking-house has been in the constant habit of presenting drafts on the State Department from consuls and ministers of the United States abroad. Until lately these were in the usual form of bills of exchange. These we presented, and in some instances, on receiving assurance that they would be paid, we left them at the department for that purpose; in other instances, not being yet payable, we would take a verbal acceptance and then discount the paper for the holder.
“ Recently two things have been added to the practice in relation to these bills: first, that they are to be made payable at fifteen days’ sight, with acceptances waived; and secondly, indorsement by procuration excepted.”
The defendants gave in evidence four several contracts between Russell, Majors & Waddell, the drawers of these bills of exchange, and the United-States; the first dated the 16th day of January, 1858, for the transportation of army supplies from Forts Leavenworth and Riley, in Kansas, and other points on the Missouri river, to any depot or post in the Territory of Nebraska south of latitude forty-four north; in the Territory of Oregon south of the same latitude, and to the Territory of Utah to its south boundary, agreeably toa schedule of prices annexed to the contract. The contract made provision for payment from time to time, as the services might be performed, upon certificates of an officer of the quartermaster’s department, a portion when a train was started, and the balance when the supplies should be delivered at their destination. They were to he paid at the rate specified, either at the quartermaster’s office at Fort Leavenworth, or by draft on the assistant treasurer at New York, or in spiecie, as they might elect.
One dated March 3, 1858, for the delivery of thirty-five hundred beef cattle, to he delivered between the 1st of October, 1858, and the 1st of January, 1860, to the principal officer or agent of the subsistence department with the army of Utah, in lots of not less than two hundred and fifty head at any one time. Payment to be made by the commissary of subsistence at St. Louis, on presentation of duplicate receipts, for any delivery.
*275 The third contract was the delivery of 763,000 pounds of flour to the same army, at Great Salt Lake, or at Camp Floyd. Payment was to he made to them by the commissary of subsistence at St, Louis, in checks upon the sub-treasurer in New York, on presentation of duplicate receipts of the officer or agent of the subsistence department at the points of delivery, for each partial delivery.
The fourth and last contract was dated the 11th day of April, A. D. 1860. It was for the transportation of quartermasters’ stores from Forts Leavenworth and Riley to Fort Union, in the Territory of H ew Mexico, and for the years 1860 and 1861; the prices to be paid, as is usual in all such contracts, were contained in a tabular statement, or schedule, annexed to it, And. the contractors were to be paid for such service, and according to the rates contained in the schedule, at the office of the quartermaster’s department at Fort Leavenworth, by drafts upon the assistant treasurers of the United States at St. Louis, Missouri, or at New York city; or in specie, (if equally convenient to the quartermaster’s department at Fort Leavenworth,) as the said Arm might elect.
It appears by the evidence introduced by the United States, that some time early in 1858, and during the period covered by these contracts, under arrangement between these contractors and Floyd, the Secretary of War, the contractors drew a large number of bills of exchange upon Floyd, as Secretary of War, which he accepted as such; that these bills of exchange so drawn and accepted amounted, in the aggregate, to over six millions of dollars. All of them have been taken up or returned by Russell, Majors & Waddell, except about eight hundred thousand dollars, which are still outstanding, and of which those in suit form a part. A portion of the acceptances were taken up by the sale and negotiation of Indian trust bonds, abstracted from the office of the Commissioner of Indian Affairs, in the Department of the Interior. The United States also proved, by clerks in the War Department during the time these acceptances were given, that no regular entry or record was made in the department of these acceptances, as was usual in the ordinary and accustomed official transactions of the department.
The testimony of the claimant was taken by the Solicitor of the United States, and as it may have an important bearing on the case, the material part is here quoted:
“I have $30,000 of those acceptances, and have none, individually, except those embraced in the suit. I bought them in the summer of 1860 — the particular ones I hold now. I bought one for $5,000 *276 dated November 28,1859, on the 9tli of June, I860; one for $10,000, dated May 8, 1860, July 3,1860; one for $15,000, dated August 17, 1860, December 4, 1860; all of J. B. Simpson, agent of the drawers. At tbe time I bought I had seen Russell a few times. He was in Boston, I think, two or three times in the summer of 1860, He was one of the firm who drew these bills; that is, he represented himself so, and I presume he was. I knew these drawers wore contractors with the government; that was expressed on the bills, as in pursuance of the contract — a confession of indebtedness arising out of certain contracts. I made no inquiries in regard to these acceptances in suit, particularly, before purchasing them; I had made inquiries at an earlier period. The information I possessed in regard to these I had acquired before those named in the suit. I derived information from various sources; the acceptances had been on the market some time; the Bank of the Republic, Duncan, Sherman & Co., Morgan’s house — Governor Morgan, of New York. I knew Mr. Soutter, president of that bank. Russell told me after I bought some acceptances that he was their (the firm’s) financial agent. I had no information from Mr. Soutter in regard to the acceptances in suit before I purchased them; I had not seen him for months. I had information from him before I purchased these as to acceptances of a similar character from him and from others. I never was advised that these acceptances were drawn in pursuance of contracts to be performed. I had no conversation with Mr. Russell in regard to the character of the acceptances, and never was advised by him as to the manner in which they were to be paid. I did see Mr. Simpson, perhaps, two or three, times while dealing for these acceptances, but it was done, perhaps, mostly by correspondence. I had no conversation with him in regard to them; he gave me no information as to them. I had information in regard to similar acceptances from the Bank of the Republic, Duncan, Sherman & Co., Morgan & Co., and also of Secretary Floyd — that’s all; but I also inquired, however, of Secretary Toucey. I first saw Secretary Floyd in regard to acceptances in January, 1S60. We had bought them previously. I had no information from him personally before that time, but had seen his letters to the Bank of the Republic. I called on Governor Floyd with a letter of introduction from Secretary Toucey. I asked the governor if he had issued such acceptances; if there was authority for them; if there was consideration to the government; and if they would be paid at maturity without any further appropriation by Congress ; to all of which questions he answered in the affirmative; He *277 gave a lengthy statement; first spoke about the exigencies of his department growing out of the war; the necessity of supporting and sustaining the army over the plains in the winter; the length of the service; the long time required to get back vouchers. This is, substantially, nearly all that I recollect. I cut him short by saying I didn’t come to inquire .whether he was administering his department well or ill, but to make specific inquiries. I did not understand from Governor Floyd whether the contracts had or had not been fulfilled, ■ and I had no information od the subject. I understood, of course, I was to get payment from the department of the drafts. I had no information as to the manner in which money was disbursed in the department. I asked Mr. Floyd if these drafts would be paid without further appropriation, as before stated. I understood from him that there had been an appropriation for the Utah war. The reason Governor Floyd gave for paying in acceptances rather than in money was that he couldn’t advance 'the money but upon vouchers, and these bills were given to wait their return — i. e., the return of the vouchers. The first acceptances I ever heard of were some bought by my partner some time in the year 1859. They sold for less than government stock; funded debt is, of course, always higher than commercial paper.”
The defendants also proved thai there were large appropriations for subsistence and transportation for the army for those years. The unexpended balance of the appropriation for those purposes on the 1st July, 1859, was $357,696, and on the 1st July, 1860, was $673,044 79.
Upon these facts, presented by the record, many questions have been raised and elaborately discussed. The court has been much aided and instructed by the research of counsel and the ability with which the cause has been presented. We have given to it all the examination and consideration of which we are capable; and I will proceed to state the conclusions at which we have arrived, and some of the reasons upon which such conclusions are based.
The main question is, whether these instruments sued upon are valid bills of exchange of the United States. If they are, all the incidents appertaining to commercial paper attach to and inhere in them, and in the hands of a holder for value, which the claimant is admitted to be, no facts alleged or proved in this case can avail the defendants. On the other hand, if they' are not bills of the United States, such rules do not apply, and they are, in the hands of the holder, subject to the same equities which might have been set up between tlie origi *278 nal parties. And this inquiry resolves itself into several subordinate questions: *
1. Had Secretary Floyd the power or authority to bind the United States by such instrument, under the circumstances shown in this case ?
2. Are the instruments in suit, in form and substance, bilis of exchange?
3. Is there proof of such circumstances brought home to the claimant, before he became the holder of these bills, as will render them subject, in his hands, to the same equities which exist between the original parties 1
I. The claimant derives the power of the Secretary of War in the premises, from various sources:
1. From the Constitution of the United States, article 2, section 2, as the principal officer of an executive department; and from the act of Congress, approved August 7, 1789, chapter 7, 1 Statute, 50, as the representative of the President to perform the duties enjoined in relation to the army, and its supplies and transportation.
2. From various statutes imposing upon the Secretary certain duties, and conferring powers in relation to contracts for supplies and transportation for the army, as well as the general management and control of the affairs of the department.
3. From the usuage of the several departments to accept the bills, and from the recognition of the practice by Congress.
4. That the Supreme Court of the United States, in a solemn decision directly on the point, has affirmed the power of the Secretary and the liability of the government.
II. The Solicitors for the United States controvert all these positions, and affirm that the exercise of such a power by the Secretary was unwarranted, because:
1. That such officers aie mere special agents of the United States, whose duties are defined, and whose powers are limited by law, and that those duties do not require, nor their authority allow, them to decept bills of exchange for the United States.
2. That the true construction of the Constitution and statutes of the United States not only does not confer the power claimed, but actually denies and forbids its exercise by such officer.
3. That no such usage as that claimed exists; and even if it does, being contrary to law, it is of no binding force.
4. That the judicial authorities cited in support of the power do not *279 sustain it to the extent necessary to give validity to the instruments in suit.
The Constitution of the United States, article 2, section 2, provides : •“ The President shall be commander-in-chief of the army and navy of the United States, and of the militia of the several States when called ■into the service of the United States; he may require the opinion, in writing, of the principal officer in each of the executive departments, upon any subject relating to the duties of their respective offices;” and in section 3, “ He shall take care that the laws be faithfully executed.”
By the act approved August 7, 1789, it was provided: “There ■shall be an executive department, to be denominated the Department of War, and there shall be a principal officer therein, to be called the Secretary for the Department of War, who shall perform and execute such duties as shall from time to time be enjoined on, or intrusted to, him by the President of the United States, agreeably to the Constitution, relative to military commissions, or the land or nayal forces, ships or warlike stores of the United States, or to such other matters, respecting military or naval affairs, as the President off the United States shall assign to the said department. And, furthermore, the said principal officer shall conduct the business- of the said department in such manner as the President of the United States shall from time to time order or instruct.”
This provision of the Constitution and the act quoted form the basis of the duties, functions, and powers of the Secretary of War. He is the organ of the President in all matters relating to the avmy and the military affairs of the nation. Whatever duties are devolved upon, or powers reposed in, the President in reference to these, can be performed or exercised through the Secretary of War. And so long as he continues within the line of his duty and the scope of his powers, his acts are held and regarded as those of the President him■self. For it will be observed that the Constitution and statute place the department and its Secretary under the complete power and control of the President, as the means of carrying his will and orders into ■effect. But it is not to be inferred from this that the Secretary is a mere clerk, to register the orders and execute the commands of his superior officer. On the contrary, from the nature and necessities of the position, it involves the highest responsibilities, and constantly calls for the exercise of the soundest judgment and discretion; and where such judgment and discretion are exercised, in respect to any purely executive function appropriate to that department, every other *280 department of the government is bound by the action. It is conclusive.
Are the acts now drawn in question of this character ? Has a Secretary of War general unlimited power to bind the United States, by indorsing or accepting negotiable paper ? If the power is not unlimited and general, by what is it circumscribed and defined ? There can be no doubt he can contract in respect of any matter connected with the duties of his office in any manner not prohibited by law. His duties- and his powers are correlative and coextensive. But is there any duty to be performed by the Secretary of War that requires he should possess the power and discretion claimed in this case % Does the fact that it is the duty of the Secretary of War to have the army supplied with subsistence and transportion confer upon him the power, under the pretext of performing this duty, to bind the United States as a surety or accommodation acceptor, for a contractor for such supplies and transportation ? If the Secretary of War may do so, all the rest of the heads of the departments possess the same authority. If they may do so to any extent, they can to every extent. The exercise of the power is limited only by the government credit or the amount capable of being negotiated. This would place it in the power of an unfaithful cabinet officer to embarrass, if not entirely destroy, public credit, and endanger the security of the nation itself. Such a view, we conceive, is opposed to the genius and structure of our system. In that system as contained in our Constitution, separate and distinct departments were constituted, each possessing its appropriate powers and functions; all intended to act in harmony, while each should operate as a check and a balance on the other. Mr. Justice Story, in his Commentary on the Constitution, -vol. 1, sec. 520, says: “In the-establishment of a free government, the division of the three great powers of government — the executive, the legislative, and the judicial— among different functionaries has been a favorite policy with patriots and statesmen. It has by many been deemed a maxinrof vital importance that these powers should forever be kept separate and distinct.”' Our Constitution we think wisely separates these departments. It limits and defines the general scope of the powers of each. It gives to Congress alone the power to raise revenue, to levy taxes, or to borrow money on the credit of the United States. And such money shall not be drawn from the treasury but in consequence of appropriations made by law.
Constitutional checks and guards would be of little avail if the power *281 of a Secretary is as extensive as is contended for in this case. He need not ask Congress to borrow money on the credit of the United States, and direct how and for what purpose it shall he expended. This he can do himself. He can accept or indorse negotiable bills- or notes, and put them into the market, hind the faith and credit of the nation for their payment, and apply the money as he pleases. This, too, it is claimed, he can do, whether the government receives any consideration or not.
We should hesitate to decide that Congress has any constitutional right or authority to apply the public money to any other than a public purpose ; or that even by positive enactment they could authorize and empower executive officers so to dispose of it. The validity and constitutionality of an act of Congress which should authorize a Secretary of a department, at his own discretion, to accept bills of exchange as surety, or for the accommodation of an individual, without consideration, and for no purpose connected with the public service, would he open to grave and serious discussion. Yet this vast, this more than imperial power, is said to lodge, not in any single secretary, hut in all and every executive officer who may be charged with the duty of making contracts in regard to the public service. For the argument is, that the officer possesses the authority as an incident of his power to contract; and this would give it alike to a cabinent minister or an assistant commissary.
It is said that the constitutional prohibition is not impinged upon, because, though the debt may be created, the money cannot he obtained until the appropriation is made. This would make the Constitution “palter with us in a double sense,” and fritter away the pith and marrow of the whole provision. Congress becomes, in effect, the mere agent or auxiliary of the Executive to provide for the payment of the debts he has created; and thus, instead of being the representative embodiment of the national sovereignty of the people, Congress-becomes an appendage to the absorbing and overshadowing power of . the Executive; and, instead of being- co-ordinate, the former becomes subordinate. We cannot believe that it was ever intended by the framers of our government to confer any such powers upon the executive branch. If this were so, then the idea that Congress alone can declare war and make peace, borrow money and pay the debts of the United States, raise and support armies and navies, is a mere delusion and a chimera; for the Executive can do all these things without the intervention of Congress, or even in opposition to their will, if he can com *282 mand the means to cany them out. If the theory contended for be true, the President need only order a secretary or other subordinate to issue bills of exchange, and when negotiated they will bind the United States. The courts will be bound to sustain them; Congress will be equally bound to furnish the means to liquidate the debt. When this, if ever, shall become the settled practice of the nation, and Congress shall assent to and acquiesce in the usurpation, it will but need the sanction of the judiciary to make the subversion of the Constitution complete,'and render the powers of the Executive not only supreme but supernal.
It is true that the dangerous nature and character of any power, aud its liability to abuse, is no valid argument against its proper exercise, where its existence is beyond dispute. But where the contest is as to the existence of such a power, then, if it can be shown that its exercise is inconsistent with the structure, genius, and policy of the government, and that it may lead to collusion, fraud, and usurpation, reasons of great weight arise against its existence. We are of those who believe that this is a government of limitations and of law ; that the executive officers, and even the President himself, except as to the purely executive functions conferred by the Constitution, are bound by and subject to the laws of Congress.
How, then, stands this case upon the statute law of the land ? Is the contract set up here authorized or forbidden by Congress % The claimant contends that this contract is authorized by the act of April 14, 1818, (section 7, 3 Statutes, 427,) entitled “ An act regulating the staff of the army.” The provisions of that section are as follows : “ That supplies for the army, unless in particular amd urgent cases the Secretary of War should otherwise direct, shall be purchased by contract, to be made by the Commissary General on public notice, to be delivered on inspection in the bulk, aud at such places as shall be stipulated, which contract shall be made under such regulations as the Secretary of War may direct.”
So, also, the act of May 1, 1820, 3 Statutes, 508, sections 5 and 6. The fifth section authorizes the President to direct that a portion of the moneys appropriated for the subsistence of the army, for forage, for the medical and hospital department, and for the quartermaster’s department, be transferred and applied to any of the aforementioned branches in the same department, and also a similar provision for the navy. The sixth section is as follows : “ That no contract shall hereafter be made by the Secretary of State, or of the Treasury, or of the *283 Department of War, or of the Navy, except under a law authorizing the same, or under an appropriation adequate to its fulfilment; and excepting, also, contracts for the subsistence and clothing of the army and navy, and contracts by the quartermaster’s department, which may be made by the Secretaries of those departments!’ From the fact that the Secretary has power “ in particular and urgent cases” to contract for supplies and transportation, even where there is no law authorizing the contract, or any appropriation adequate to its fulfilment, it is argued that the law east upon him the duty and the right to determine what constitutes a particular and urgent case. And so having the right to contract, he might make it in any form, evidenced by any instrument not forbidden by law.
That is, in order to sustain the case, we have to presume conclusively that there was an urgent necessity for transportation and supplies ; that the case would not admit of the delay that the making of a regular contract would occasion ; that Floyd bought these supplies and secured this transportation from and through Russell, Majors & Waddell; that there was no appropriation adequate to the payment or purchase of them; that there was no money in the treasury to meet the demand; that, in this extremity, to save the army from ruin, and the country from destruction, Floyd made this contract, and averted these calamities by giving these negotiable bills of exchange as the price of the country’s salvation.
The fallacy of the argument lies, in the first place, in setting up the presumptions in opposition to the facts proved in the cause; and secondly, in claiming for them an incontrovertible character and conclusive effect. Wherever such presumptions have any existence and application, they are merely prima facie, and continue only until overcome by countervailing testimony. A man is presumed to be innocent, yet he may he proved to be guilty. A debt secured by specialty is presumed to be paid in twenty years, but it may be proved to he still owing. Personal property in possession of a man is presumed to be his own, yet it may be proved to be that of another. An individual absent for the period of seven years without any tidings from him is presumed to be dead; he may be proved to be in full life, (1 Green. Ev., sec. 33 et seq.) Is there even such, prima facie presumption in this case 1 Where an agent has general and plenary powers, and the principal claims that any particular transaction is excepted, it lies upon him to prove and sustain the exception. The presumption in that case is in favor of the power to do the act in question. *284 But where, as here, the authority of Floyd is rested on an exception, or saving contained in an act — where it depends upon an exigency, and only then for a special purpose, the presumptions are the other way, and the proofs must come from the other side. Nor does his exercise of the power raise any presumption of the existence of the special circumstances upon which the authority for it must rest. For that would involve us in the absurdity of holding that an agent acquires the power to do an act by the violation of his duty and the abuse of his authority. It is not in any sense like the case of the Philadelphia and Trenton Railroad Company vs. Stimpson, 14 Pet., 448. In that case the powers of the President and Secretary were general, plenary, and complete over the whole subject-matter. They were not, as hero, circumscribed and special. But even there it was held to be a mere prima facie presumption; for, says Mr. Justice Story, “ It is a presumption of law that all public officers, and especially such high functionaries, perform their proper official duties, until the contrary is proved.” But whatever may be the abstract rule applicable to such a case, standing on presumptions alone, can make very little difference in this case. For it is not pretended that any such emergency in fact existed. There was no impending clanger. The treasury was overflowing; the appropriations were abundant and ample; supplies were plenty; contracts for subsistence and transportation had been made by competent authority; there had been no failure to perform the contracts. And after meeting every want and supplying every demand, a large surplus remained in the treasury for these objects. The reference to the matter of the contracts for supplies and transportation on the face of these bills was doubtless resorted to for the purpose of masking and concealing the true nature of the transaction. It was a mere scheme to make the public funds or the public credit available for the purposes of private gain. *
Such a use of the public faith or funds is expressly forbidden by statute. The 57th section of the independent treasury act, 9 Stat., 59, provides : “ If any officer or other person charged by this act, or any other act, with the safe-keeping, transfer, or disbursement of the public moneys, shall convert to his own use, in any way whatever, or shall use by way of investment in any kind of property or merchandise, or shall loan, with or without interest, or shall deposit in any bank any of the public moneys intrusted to him for safe-keeping, disbursement, or transfer, or for any other purpose, every such act shall be deemed to be an embezzlement of so much of said moneys as shall *285 be thus taken, converted, invested, used or loaned, which is hereby declared to be a felony.”
So in regard to making advances to contractors, the law is equally stringent and prohibitory. The statute of 31st January, 1823, (3 Stat., 723,) enacts, “ That from and after the passage of this act no advance of public money shall be made in any case whatever ; but in all cases of contracts for the performance of any service, or the delivery of articles of any description, for the use of the United States, payment shall not exceed the value of the service rendered or of the articles delivered previously to such payment.” There are two exceptions only made in the act. It allows an advance to disbursing officers, and to officers serving on distant stations, under the special directions of the President. The second section requires all officers to render their accounts at the treasury quarter-yearly, or oftener if required. The third section provides that where any officer or agent of the United States shall offend against the first and second sections of the act, he shall be reported by the head of his department to the President, and be by him dismissed the public service.
It would he almost impossible to frame more general, sweeping, or stronger prohibitions than these statutes contain. They indicate a purpose on the part of Congress that the public treasure shall be used and applied only to the legitimate uses and objects of the nation. They interdict any other use or application of it by the strongest prohibitions and severest penalties. And to prevent evasion under color of law, they enact that no advance shall be made upon any contract beyond the service actually rendered or articles delivered. These provisions and restrictions apply to every officer, from the highest to the lowest. They bind the President and a Secretary as much as they do any other or inferior officers or agents. Every reason which calls for their application to the transactions of inferior officers applies with increased and increasing force as we ascend to those of higher grade and greater influence and power.
The argument that the act of 1823 does not apply to the head of a department nor prohibit him from making advances as he may please, because the act requires him in all such cases to report the delinquents to the President, and upon such report the delinquent is to be dismissed, cannot be sustained. There is no one to make such a report in the case of the head of a department, and it is therefore contended that this shows it applied only to inferior officers or agents charged with the disbursement of public funds. But in the case of the heads of departments, it is presumed that the President, whose agents they *286 are, and under whose direction aud control they act in their several offices, will see that they perform their duty with fidelity and do not violate the law. And failing iu that,, he will promptly apply the remedy; aud besides, they are liable to impeachment.
Another argument is, that though these acts may prohibit the advance and'impose a penalty on the officer for making it, yet they do not affect the validity and legality of the acts themselves.
Whenever a statute annexes a penalty to the doing of any designated act, it amounts to a prohibition of such act, even though it be not expressly forbidden, and in all such cases it renders the act illegal ; for what the law forbids must be unlawful. In this case we have both the penalty and the prohibition in both the acts cited, in plain and distinct terms.
It is, however, further urged that though the act may be prohibited by statute, and the parties actually engaged in it subject to punishment, yet negotiable securities arising out of or connected with it will be upheld, in the hands of a bona fide holder, for value, except in those cases where the statute itself makes all securities, &c., void. There being no such provisions in the statutes cited, they interpose no obstacle to the plaintiff’s recovery here. This will depend upon the power of Floyd to give the acceptance, and the fact whether the claimant had notice of their taint, as being in violation, or evasion of the acts. The argument has to assume that a public officer may lawfully do an unlawful act. That he may not only bind the government without any authority of law, but even against a positive enactment. In all such cases between private individuals, sui juris, the principle applies, and the argument is correct. But where it is sought to bind a government in a case of that nature, another question arises at the threshold of the inquiry ; and that is, what right or power could the officer possess to bind the government in and by a transaction interdicted by a positive and penal statute ? The cases of Williams v. The United States, 1 How., 290, and United States v. Jones, 18 How., 92, where the act of 1823 was drawn in question, do not touch this case. They clearly come within the provisos to the act. The first was an advance to a disbursing officer under the special direction of the President, and the second to an officer of the navy serving on a distant station. They did not violate the law; they were in strict conformity to it. Nor does the case of The United States v. Gutter, 2 Curtis, C. C. Rep., 617, touch-the point. That, like the case in 1st Howard, was an action on tlie official bond of a disbursing officer — a navy *287 agent. He had been charged by the Secretary of the Navy with the payment of navy pensions, and money had been advanced to him for that purpose. He became a defaulter, and his sureties set up that the advance was illegal, not having been made by the especial direction of the President, as the act requires. But Mr. Justice Curtis overruled the defence, on the ground that the acts of the Secretary of the Navy were to be regarded as those of the President, in reference to the affairs of his department, and that the act teas made for tihe protection of the United States, and did not enter into the contract of suretyship with the obligors in the bond.
Nor can it be maintained that the contractors, Bussell, Majors & Waddell, were in the military service, employed on distant stations, and so within the exception permitting advances. As the law stood in 1859 and 1860, when these transactions had their inception, contractors were not in any sense regarded as in the military or naval service. It required the express provisions of the act of 2d June, 1862, sec. 16, to bring them into the service, of that branch for which they were contractors, and to render them subject to court-martial, and amenable to the articles of war and the regulations of the land and naval forces.
We do not think, because it was not money that was advanced to the contractors, but negotiable acceptances payable at a future day, that it did not come within the prohibitions of the statutes against advances or loans. Such instruments in the commercial transactions of the country pass from hand to hand almost as readily and freely as money. To hold this view would be opening the way for the evasion of the law. The transaction was clearly either an advance to .these men upon the contracts they had with the government, or it was a loan of the public money or credit to them. In either aspect it was in direct violation of the prohibitions of Congress. It was plainly illegal. And being so, it goes to the very foundation of Floyd’s .authority. He could not be the agent of the United States to do that which the laws of the United States expressly forbade. He had no more authority to accept such bills for the United States than would the agent of a private party, who was furnished with funds and authorized to purchase certain goods, and pay for them when delivered, have a right to bind his principal by bills accepted for his own private debts, or for the accommodation of a third party. A party dealing" with an agent must in all such cases look to his authority. , And in regard to public agents especially, whose duties are defined and whose authority *288 is conferred by law, and whose powers do not arise by implication, as is often the case with private agents, there can be no propriety in departing from or relaxing the rule.
There is still another act of Congress which bears more or less upon the case. It is entitled “An act to prevent frauds upon the treasury of the United States,” approved 26th February, 1853, (10 Stat., 170.) The first section provides “that all transfers and assignments hereafter made of any claim upon the United States, or any part or share of, or interest therein, whether absolute or conditional, and whatever may be the consideration therefor, and all powers of attorney, orders, or other authorities for receiving payment of any such claim, or any part or share thereof, shall be absolutely null and void, unless the same shall be freely made and executed, in the presence of at least two witnesses, after the allowance of such claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof.”
It can scarcely bo contended with any degree of plausibility tha't Bussell, Majors & Waddell could have assigned thirty thousand dollars of their claim, to be earned on their contract, to the claimant, so as to have made it binding on the government, even had Floyd sanctioned the transfer; for the statute, in express words, makes every transfer or assignment absolutely null and void if made before the allowance of the claim, the ascertainment of the amount due, and the issue of the warrant for its payment. It is not in the power of any one or all the executive officers of the government, by any devices which they can employ, to take a case out of the act which by its facts and circumstances falls within its enactment. This power rests with Congress alone. If, however, that can be done by circumvention and evasion which may hot be done directly, laws and statutes will be frail things indeed. The bill, taken in its best light, was an order drawn on the finid to be earned in the future under the contract referred to. If this act had not intervened, it might be regarded as an equitable assignment or transfer, in the nature of an appointment or authority to draw so much money. But the law will not sanction any arrangement or scheme by which plain and positive enactments may be evaded or disregarded.
There is not a case, to which the act can apply, in w^iich a bill of exchange may not be resorted to, with a view of reaching the very object and purpose of an assignment, and thus the whole purpose of the enactment be thwarted and defeated. We think these bills of ex *289 change were adopted to accomplish what the law forbade. All attempts of that kind must prove unavailing where they require the aid and sanction of a court to carry them into execution. The act in this case is broad enough to cover every device that may be adopted to give effect to the transfer. Whatever form the instrument may take by which it is sought to evade the law, with whatever apparent equities it may be attended, however innocently a claimant may have parted with his money on the faith of the transfer, are considerations which cannot enter into the decision. The statute meets us at every turn with its inexorable announcement, that every authority to receive any part of such a claim shall be absolutely null and void.
It is like the case of a usurious or gaming contract, which the law not only declares illegal, but avoids all securities given in execution of such contracts. In such cases a note or bill given for the tainted consideration, even in the hands of a bona fide holder, for value before maturity, and without notice of the character of the instrument, is irrecoverable and void. There is no means by which the taint can be purged or vitality imparted to it. No court can breathe into it the breath of life. The statute kills it, and it is dead once for all. For it there is no resurrection. (See Lane v. Waller, Dougl., 736; Lowes v. Mazzaredo, 1 Stark., 385; Chapman v. Black, 2 Bar. and Ald., 590; Henderson v. Benson, 8 Price, 288; Chitty on Bills, 87.)
“ The bona fide holder of negotiable paper is not protected against those defences which go to the essence of the paper, and either by common law or statute annul and avoid the contract, or which interfere and prevent his acquiring a legal title to the paper.” (1 Pars, on Notes and Bills, 275.)
“ Where notes are made void by express statute they cannot become good in the hands of subsequent holders, and upon no such note can a subsequent holder have a claim against the maker.” (Ibid., 218; Story on Prom. Notes, sec. 192; Bayley on Bills, 512; 3 Kent’s Com., sec. 44, p. 79, 5th ed.)
III. Upon the question of Floyd’s authority, as affected by usage, we need say but little. In the statement of the case we have set forth the substance of the evidence given to sustain the usage. Mr. Smith’s evidence relates to transactions in the War Department, but so far as they are analogous to this case they appear to have been before the act of 1823, and all before those of 1846 and 1853. Mr. Biggs’s testimony applies solely to transactions in the Navy Department and Department of State. In all the cases spoken of by him the transac *290 tions related only to the transmission of funds to disbursing officers, or for the pay of those serving on distant stations, both classes falling within the exceptions contained in the provisos to the act of 1823. To sustain these bills, and find the power, in a long’ and well-established usage, for a Secretary of War to bind the United States by them, it would require the proof to go much further. Can there be a usage to accept bills without any consideration; or to pledge the credit of the nation as surety for, or the accommodation of, a contractor 1 Could any such usage be sustained if proved? Bills of exchange and drafts have undoubtedly been used extensively in the affairs of government. They have, however, been mostly employed in the transfer and disbursement of public funds. Disbursing officers serving on remote stations having purchased supplies or hired the services of others, instead of having the funds remitted to them, have drawn their draft upon the proper department. It is accompanied by the proper voucher; is accepted by the proper department, and paid at the treasury. The government in no instance that has been shown held itself liable to accept or pay any such bill unless a consideration has been received for it, and the purchase of the supplies or the hiring of the service was a part of the legitimate duty of the officer drawing the bill or draft. Especially would they refuse to do so where such officer had been provided with and held in his hands the funds applicable to and appropriated for that purpose. Where there are funds in the treasury, and appropriated by Congress, the law requires that for supplies furnished or services rendered the government, the money shall be paid, on certain vouchers being furnished and having the account adjusted at the treasury in the mode pointed out. Can wo recognize a usage in contravention of this ? Can you establish that it is a binding custom for the government to give a bill of exchange before the service is rendered or the articles delivered, without a voucher produced or an account adjusted? That the government will pay, whether any consideration is received or not ? A usage such as that, if even proved, would be unavailing, because unlawful. In all the cases of drafts or bills drawn by disbursing officers on a department, in favor of a contractor, they are not for advances, but for services rendered or stores delivered. They are accompanied with regular accounts and vouchers, and upon being presented to the proper department, are accepted, sent to the Treasury Department, where they are audited, revised, registered, and paid. But we are quite safe in saying that no usage has been, shown authorizing the giving of such bills at long dates, in advance of the service or delivery of goods, anticipating *291 tlie time of payment provided for in the contract, their acceptance by the department and handing them over to the payees or drawers, to be hawked about in the market. Much less has a usage been shown for the government to recognize and pay such bills as have been drawn or accepted by any of its officers or agents, without consideration, or by fraud or collusion. If any such illegal and discreditable practice has prevailed among the officers of government, no matter how long continued or extensive, it can never ripen into .usage. No number of breaches of the law-can abrogate or repeal it. And the public credit and sound policy and morality alike require that a fair observance of the rules of law shall be required in all dealings with the government.
IV. We come now to the inquiry, whether, after all we have said, the questions discussed are res judicata. Have the existence of the usage, the power of the Secretary, and the validity of these instruments, as bills of exchange, been settled by the Supreme Court of the United States ? The affirmative of these propositions has been pressed upon our consideration with great power and surpassing ability. The; authority of the decisions of that high tribunal, as well as our deference to its views and opinions, has induced us carefully to weigh and consider this argument, and diligently to compare the cases cited and relied on with the case in hand. That which is supposed to be decisive of this case in all its aspects is the case of the Bank of the Metropolis vs. The United States, 15 Peters, 377. The striking similarity in some respects of that case with this, and the difference between them in others, have given rise to all the difficulty and solicitude we have experienced in reaching satisfactory conclusions. The bills in that case, with the difference of names and dates, were almost identical with those in suit. They purported to be drawn on and chargeable to the amouut to be earned on a contract with the United States government. They were accepted by the head of a department. They were taken by the bank in good faith. They became the holders of them in the regular course of business, for a valuable consideration, before maturity, and without notice of any facts or circumstances tending to impeach their validity. The Supreme Court of the United States held that “ when the United States, by its authorized officer, become a party to negotiable paper, they have all the rights and incur all the responsibilities of individuals who are parties to such instruments.” And that “the want of consideration between the drawer and acceptor can be no defence against the rights of the indorsee, who gave a valuable consideration for the bill. It does not *292 matter how the drawer’s account stood ; whether he was a debtor or creditor of the department; whether the-bank knew one or the other. An unconditional acceptance was tendered to it for discount. It was not its duty to inquire how the account stood, or for what purpose the acceptance was made. All it had to looh to was the genuineness of the acceptance and the authority of the officer to give it. The rule is, that a want of consideration between the drawer and acceptor is no defence against the right of a third party, who has given a consideration for the bill, and this even though the acceptor has'been defrauded by that drawer, if that be not known to such third party, before he gives value for it.”
I have thus given the points of resemblance, and the strongest expressions in the opinion of the court, in favor of claimant’s view, and will now proceed to state those points of difference which we consider material or essential.
1. And first, the difference between the powers of the Postmaster General before the reorganization of the Post Office Department, under the act of July 2, 1836, and those of a Secretary of a department. Prior to this act the Post Office Department was not really one of the executive departments. It was a separate and distinct establishment, constituted and organized by Congress under that clause in the Constitution giving them power to establish post offices and post roads. The Postmaster'General, it is true, was appointed and removable by the President; but that was in virtue of the Constitution giving the appointing power to him in all cases where no other mode is provided. The office of Postmaster General was established by Congress by act of 20th February, 1792, sec. 2. (1 Stat., 234.) But unlike the heads of the other departments, he was not under the control and direction of the President. He was not the agent or means of the President in performing executive functions and duties, but the organ of the Congress in carrying into effect the post office and post road system of the nation. The powers ho exercised and the duties he performed were conferred and devolved by Congress. In the organization of the department they invested this officer with very large powers, and a wide discretion in their use and exercise. He had the power absolutely to appoint his own assistants, deputies, and clerks. lie appointed and removed at his pleasure all the postmasters of the country. He established post offices, provided for and superintended the transportation of the mails. All the accounts in his department were audited and adjusted by him, he filing his own account of the general receipts and expenditures every quarter. The funds of the department were kept *293 separate from those of the government, and were under the exclusive control of himself and subject alone to his draft. The moneys were disbursed by him without any appropriations made by Congress. For-matters in his department suits were brought in the name of “ The Postmaster General of the United States.” He was, in fact, a sort of corporation sole, with no one to direct or control his operations or exercise the power of visitation over him but Congress alone. (See act 3d March, 1825, 4 Stat., 113.)
This was materially changed by the act of July 2,1836, (5 Stat., 80,) reorganizing the Post Office Department. It was then placed on a footing of greater equality with the other departments. An auditor was appointed specially for it; the funds were transferred to the treasury of the United States; specific appropriations were required to be made for the various items or branches of service in the department; and the money was only to be paid out on accounts settled, vouchers filed, and a regular warrant, as in the case of accounts in any other department. The whole arrangement was essentially and radically changed; and the wide and almost unlimited discretion theretofore vested in the Postmaster General abridged and curtailed. But the acceptances in the Bank of the Metropolis case, and all the transactions connected with their origin and inception, occurred in 1835, while those great powers and wide discretion still remained in the Postmaster General. Those powers are much greater, and the discretion broader, we apprehend, than were ever confided to any Secretary of War; for it was not his business alone to control and pay out the money of the department, but out of the service with which he was charged to raise the means and revenue to carry on all its operations. This authority was so great and so extensive that the Supreme Court, in the case cited, simply contented itself with assuming that he had authority to give the acceptance in that case. And, indeed, that was not seriously controverted by the government, for the defence was pricipally placed upon the ground of want or failure of consideration. The difference is so marked and strong in the powers and duties of the parties who gave the respective acceptances, that we cannot regard the one as conclusively affirming the power of the other.
2. The course and habit of dealing betw'een the Post Office Department and the bank, in the case in 15 Peters, constitutes another marked difference between that case and this. It was proved in that case that many such drafts had been discounted by the bank, at the instance of the Postmaster General, for his accommodation and that of contractors under him. Here the holder had no such course of dealing with the *294 department. He had not, like the bank in that case, been in the constant habit of taking these acceptances, presenting them at maturity, and having them paid by the department; for the proof does not show that a single one of the great number and amount issued was ever paid by the United States. In that case, too, the funds of the department were deposited in the name and to the credit of the Postmaster General with the holders of the acceptances. They might justly have regarded them as mere drafts on, or appropriations of, so much of the funds as should be in their hands at the maturity of the bills.
There the bills of exchange were given in renewal of others of the department overdue, and which had been discounted for the accommodation of the department. Here the bills were made payable at a bank whore the government had no funds, and where it would have been a felony, by the express provisions of the statute cited, to have placed them; and instead of their having been made for the accommodation of the government, they were for private accommodation alone.
3. The necessities of the public service in the Post Office Department at the time the acceptances passed upon in 15 Peters were given is another material difference between the two. cases. In our case it is established by the record that there was no lack of money or of appropriations for every supply needed; and at the end of the years there still remained large unexpended balances not required. In that case the public necessities required a resort to a credit. In this case there was no such occasion whatever.
. 4. In the case cited there was no evidence impeaching- the honesty of the transaction. The drafts were given to promote and forward the public service. In the case at bar they were issued in bad faith and for private benefit.
5. In that case the act of January 13, 1823, was not set up by the United States, nor passed upon by the Supreme Court. In this one it is made a substantive ground of defence.
6. There was then no statute forbidding the transfer of an unsettled and unliquidated claim upon the United States. How the act of February 26, 1853, renders every such transfer null and void.
7. In that case the money raised on the acceptances was for, and was applied to, the use of the United States, in the payment of their debts. In the case we are considering it was for the benefit of the drawers, and the government has, in fact, received no sort of value or consideration.
8. In the Bank of the Metropolis case there were no circumstances of suspicion brought home to the holders before the acceptances were *295 discounted by them. In our case the holder was informed by Floyd that the acceptances were made and given by him to evade the statute forbidding the advance of money.
9. In that case the United States defended mainly upon the ground of failure of consideration. Here it has been on the want of authority in Floyd to accept, and of fraud in their inception. These differences, we think, are sustained by a careful comparison and analysis of the two cases. Throughout the whole case in 15 Peters the power of the Postmaster General to give the acceptances is taken for granted. That is an element that runs through the whole case. But we do not believe that it was intended to affirm the general and unrestricted power of such an officer to bind the government by instruments of this character, irrespective of the occasion and consideration; for, says Mr. Justice Wayne, in delivering the judgment of the court, “All the holder had to look to was the genuineness of the acceptance, and the authority of the officer to give it.” In-another part of the opinion, speaking of the liability of the United States, for an overdraft upon the contingent fund, “ We do not say that an overdraft out of the bank, by authorized officers of the United Stales, is in any case chargeable to the United States unless it can be shown that the money overdraion has been applied to the use of the United States.”
We think the Supreme Court intended to limit the responsibility of the United States to such instruments as the head of a department should make or accept in the course of the legitimate business of his department for the benefit of the public service; for it could never have entered into the contemplation of that court that if an unfaithful and reckless man should find his way to tho head of an executive department, he should possess the power to embarrass or even destroy the government; that for his own benefit, or that of others, and for purposes unconnected with the administration of public affairs, in fraud of the treasury, in defiance of positive statutes, contrary to the whole genius and policy of our political system, he should have authority to contract debts without limit and pledge the faith of the government for their payment, and thus destroy its credit, bankrupt its treasury, and embarrass all its operations.
The view we have taken of the power of Floyd to bind the United States in the premises renders it unnecessary for us to examine into the form of the bills of exchange; for, being of no validity for want of authority to give them, it matters not what their form may be, nor upon what fund drawn; they are in every point of view equally unavailing as binding obligations on the United States.
*296 The only remaining question is, whether the claimant in this case had knowledge of such facts and circumstances before he became the holder of these bills, as would affect him with notice of their fraudulent and illegal character.
It is now settled, by the well-considered judgment of the Supreme Court of the United States in the case of Goodman v. Simonds, 20 How., 343, that knowledge alone of the facts which go to impeach the paper will affect the holder for value where it does not appear on the face of the paper itself. In that case all the authorities are fully and ably reviewed by Mr. Justice Clifford, and nothing more remains to be said upon the question. Tet, there is one feature here which did not obtain in that case. This claim is made on the government for an act done by one of its agents and officers, and we take it that the duty of inquiry as to the power of a public officer is much more strict than arises between private parties. Mr. Justice Story says the rule is “indispensable in order to guard the public against losses and injuries arising from the fraud or mistake or rashness and indiscretion of their agents, and there is no hardship in requiring from private persons dealing with public officers the duty of inquiry as to their real or apparent power to bind the government.” (Sto. on Ag., § 308.)
In Cone v. Baldwin, (12 Pick., 545,) the supreme court of Massachusetts says: “The defendant is not obliged to prove that the holder purchased with full and certain knowledge of the want or failure of consideration. If the circumstances attending the transfer were such as to put him upon his guard, and he made no inquiry into the consideration, he purchased at his peril.” Again, in Merriam v. Granite Bank, (8 Gray, 254,) Chief Justice Shaw, of the same court, says : ‘‘ But this rule (the presumption of title) is to be taken with a strict observance of the qualification that the negotiable security be taken in the usual course of business, without notice or reasonble cause to suspect that the party from whom it is taken has not the full title which the possession of the security and the names borne upon it naturally import.” (Snider v. Riley, 6 Barr, Pa. Rep., 164; Mill v. Croft, 5 Casey, 186.)
In our case the evidence was, by Mr. Peirce, the claimant himself, that before he became the purchaser or holder of any of these securities, he called upon Floyd to inquire into the consideration and legality of these acceptances. And in addition to his testimony set forth in the statement of the case, he deposed at another time as follows:
“I said to him, (Floyd,) while your treasury is full of money, why not give them the money 1
*297 “ He responded that there, was an express law against that, but there was authority for securities of this character.
“ In reply to the question, if there was any authority for giving these acceptances, he said that it had been the custom of the department, in certain contingencies, since the organization of the government.”
Thus we think from his own testimony, it appears that he had express and explicit notice of the illegal nature and character of the transactions out of which these securities took their rise. He know that Congress had supplied the Secretary of War with money to pay for all the supplies and transportation the army needed.
He said to Floyd, “While your treasury is full of money, why not give them money ?” Could it be contended for a moment, if in the case of a private agent, a party with whom he is dealing knows he has been furnished with money to pay for articles he is required to purchase for his principal, and instructed to buy for cash alone, that under such "circumstances he may give him credit and recover it of the principal? No such doctrine can be maintained at all. It is contrary to the first principles of the law of agency. And the claimant, and every one dealing with a public officer, are held as strictly, if not more so, to those rules of good faith which require that the principal shall not be charged with a debt, when it is known his agent or servant has in his possession the means to pay for what the principal requires him to buy.
But the evidence goes further than that in this case. Here the claimant, in addition to the fact known and admitted, that the government had furnished Floyd with the ready money to pay for all the supplies and services that he had the right to purchase or employ, is distinctly told that there is an express law against the payment of the money until the supplies are furnished and the services performed. This being a public statute, a law of the land, he was bound to know it, and take notice of it in any event. But in addition to that, he is so informed, in clear and distinct terms, by Floyd. It is true that Floyd tells him at the same time that this express law, this positive and prohibitory statute, can be evaded and set aside by a custom or usage; that though he could not advance the money directly, he could do it indirectly; that he could keep the letter of the law and violate its spirit; that he could evade its penalty while he virtually and in effect did what it prohibited and denounced. That he relied and acted upon Floyd’s opinion that it could be legally done, was his misfortune, *298 and of the correctness of which opinion he, and not the United States, took the risk; for they never insure against the fraud, or folly, or ignorance of their officer. We think in this evidence there was sufficient brought home to the knowledge of Mr. Peirce to apprise him of the illegal and fraudulent character of this paper. He was informed that it was given as advance on certain contracts on which the money was not earned. He well knew that the money had been provided and set apart by the government to pay for such service and supplies. He was aware that the money was not due by the terms of the contract; that there was an express and positive law against anticipating payment; and that this paper was given in defiance or evasion of that law. And with all that knowledge he took the paper. It is nothing to the purpose to say that he was informed that the custom of the government, or the department, permitted all this; for he was bound to know that if any such custom prevailed, it could never be anything else than mere infractions of law; that a usage in opposition to law is no usage at all, but mere repeated violations of law. Having taken the paper with this knowledge, that it was given by a public officer in violation of his duty, and in evasion of the law, he stands as an original party to the transaction, and is affected by all the equities which existed between such original parties. It is not strenuously denied that the paper in its original concoction was a fraud upon the government, and without any consideration to support it. No one would contend that Russell, Majors & Waddell could recover upon it under the evidence of this case. And in the view we have taken of the law ■and the evidence, the claimant is affected by all the defences available against them, and cannot recover.
We do not wish to be understood as charging any intentional or ■actual fraud on the part of claimant in connection with these transactions. His misfortune lay in allowing himself to be influenced by ■the false opinions of Floyd, instead of either judging for himself or taking other counsel upon the facts as they had been developed to . him. But having chosen to rely upon those opinions, and to have invested his money upon them, the risk of their correctness was with him. The government did not employ Floyd to advise or instruct persons upon those subjects, and is not accountable for the accuracy or fidelity of what he uttered; those who trust such opinions take all the contingencies. That the claimant should lose largely by his misplaced confidence is to us matter of deep regret; but because the individual who led him astray happened to be a public officer at the time *299 is no sufficient reason why the government should make good his misrepresentation.
Mr. Cushing and Mr. Goodrich for the claimant.
Mr. Ketch am, the Solicitor, and Mr. Weed, the Assistant Solicitor, for the government.
We are therefore of opinion that Floyd, as Secretary of War, had no rightful power or authority to bind the United States by the acceptances in suit; and that, even if he had, there is such knowledge of the want and failure of consideration, and of the illegal character of the acceptances, brought home to the claimant, before he became the holder, as renders them unavailable and irrecoverable in Lis hands. And being of this opinion, we find for the defendants, and direct the petition to be dismissed.