Harold **BARCLAY** and Dorothy Barclay
v.
The **UNITED STATES.**

Philip **DAHL** and Dorothy Dahl
v.
The **UNITED STATES.**
Nos. 165–61, 164–61.

United States Court of Claims.
June 12, 1964.
Rehearing Denied Oct. 16, 1964.

Charles P. Duffy, Portland, Or., for plaintiffs. William T. Schantz, Portland, Or. and Fred S. Gilbert, Jr., Washington, D. C., were on the briefs.

J. Mitchell Reese, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant. Edward S. Smith, Lyle M. Turner and Philip R. Miller, Washington, D. C., were on the brief.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

WHITAKER, Judge.

Stated in its simplest terms and omitting some important details, plaintiffs' claim is that they acquired ownership of the timber on a certain tract of land by virtue of a contract with the Indian Service of the Department of the Interior, and that they disposed of it to a corporation organized by them and of which they were the sole stockholders, except for two qualifying shares, after having held it for more than six months, and that they are thus entitled to treat the gains derived from the disposition of it as capital gains.

The Commissioner of Internal Revenue did not question that the taxpayers and the corporation were separate entities and that gain was realized when the taxpayers transferred to the corporation their rights under the contract, but he says this gain was ordinary income, instead of capital gain, and he assessed the tax accordingly.

That is the sole issue presented to us, and it is the sole issue we decide.

Plaintiffs Barclay reported the income derived from the sale of timber on the Warm Springs Indian Reservation in Oregon in their tax returns for the calendar years 1951, 1952, and 1953 as long-term capital gains; plaintiffs Dahl did the same thing in their returns for the years 1950, 1951, 1952, and 1953. In each case, the Commissioner of Internal Revenue assessed deficiencies against these taxpayers upon the ground that the income for those years was ordinary income. The taxpayers paid the deficiencies and filed timely refund claims. The claims were disallowed, and these suits followed.

The income was earned by plaintiffs Harold Barclay and Philip Dahl; their wives are parties to this litigation only because, for the taxable years with which we are concerned, they filed joint returns with their husbands. Dahl and Barclay will hereafter be referred to as the plaintiffs.

On November 26, 1948, the United States Department of the Interior issued an advertisement for bids for the purchase of merchantable timber on 51,883 acres of the Warm Springs Indian Reservation known as the "Simnasho Logging Unit." The advertisement specified that the unit contained approximately 107,-500,000 board feet of timber, of which approximately 33,300,000 board feet stood on lands that had been allotted to individual Indians. Bids, accompanied by a cash deposit of $35,000, were required to be submitted by January 17, 1949.

Harold Barclay and Philip Dahl, who for several years had carried on a partnership called the Barclay Logging Company, jointly visited the local office of the Forestry Division of the Bureau of Indian Affairs to obtain more information about the timber. Barclay then hired a timber evaluation expert, Hans Milius, and went with him and Dahl and two representatives of the Indian Services on a field trip to survey the timber. After Milius reported that he deemed the prospective purchase a sound investment, plaintiffs decided to make a bid. On January 17, 1949, the last day on which bids could be submitted, they went to the office of the Indian Bureau, where Dahl, in his own name, submitted a bid at the minimum price of $10.50 per thousand board feet for Ponderosa Pine and $6 per thousand board feet for all other species. Dahl also deposited his certified check for $35,000. This was the only bid submitted.

In response to this bid, the Assistant Secretary of the Interior on January 31, 1949, sent a telegram to the Superintendent of the Warm Springs Indian Agency, accepting Dahl's bid and instructing him to submit "a bond and supporting papers for approval." The Tribal Council of the Confederated Tribes of the Reservation, which had previously approved the terms of the invitation, agreed on February 8, 1949, to the acceptance of Dahl's bid.

Dahl signed the formal "Timber Sale Contract" and submitted a $40,000 performance bond on March 7, 1949. These documents were forwarded to Washington but were not formally approved on behalf of the Secretary of the Interior until May 2, 1949. That contract gave plaintiffs the right to the timber on the unallotted lands (i. e., the land which the Department of the Interior held in trust for all Indians on the Reservation) in the Simnasho Unit, but approximately one-third of the timber on the Simnasho Unit was on acreage that had been allotted to individual Indians, and, by the terms of the agreement with the Government, separate contracts had to be entered into with the allottees before timber on their allotments could be removed. After the Superintendent of the Indian

Agency contacted the various allottees and obtained powers of attorney from them, he entered into separate contracts with plaintiffs on their behalf. These contracts were signed between October 10, 1949, and April 8, 1953.

During April of 1949, with the permission of local officials of the Bureau of Indian Affairs, plaintiffs began the construction of sawmill on the Simnasho Tract. The mill was constructed with the funds, equipment, and personnel of the Barclay Logging Company, a partnership in which Barclay and Dahl were equal partners, and its cost was charged to the accounts of the plaintiffs on the partnership books in equal amounts. Construction of the sawmill was completed in November of that year.

On October 21, 1949, plaintiffs formed a corporation, called Dahl Pine, Inc., under the laws of Oregon. Four days later, at the first meeting of the stockholders, plaintiffs transferred the uncompleted sawmill to the corporation in exchange for all the stock and the corporation's promise to pay Barclay Logging Company the difference between the cost of the mill and the par value of the stock. On the same date, Dahl lent $100,000 in cash to the corporation, and he also executed a formal assignment to Barclay of a one-half interest in his contract with the Indian Service, in consideration of the payment of one-half of the sums Dahl had paid the Indian Service. The purpose of this assignment was to put into written form the prior oral understanding between Dahl and Barclay that they would share equally in the profits resulting from the contract.

After Dahl Pine, Inc., had been formed, it carried out the terms of the parties' previous oral understanding relating to the cutting and selling of the timber, which was that Barclay Logging Company would cut the timber after it had been scaled (i. e., measured to determine how many board feet of lumber it contained) by crews from the Indian Service, and deliver it to the corporation's mill. The corporation would then cut it into rough lumber and sell it. Out of the revenue it received, the corporation would pay plaintiffs the fair market value of the timber from which the logs had been cut.

The taxpayers say they are entitled to treat this income (the difference between what they paid for the timber and what Dahl Pine, Inc., paid them for it) as long-term capital gains under the provisions of either section 117(a) or section 117(k) (2) of the Internal Revenue Code of 1939. Section 117(a) deals with capital gains generally, while section 117(k) speaks specifically of transactions in timber. Defendant does not deny that gain was derived by plaintiffs from their sale to Dahl Pine, Inc., but it says it was ordinary income and not capital gain. It denies the applicability of either section 117(a) or of section 117(k) (2).

We hold that these taxpayers are entitled to treat the income derived from the disposition of timber from the lands held in trust for all Indians on the Warm Springs Reservation as long-term capital gains under section 117(k) (2) of the 1939 Code, but, as to the income derived from timber on allotted lands, we hold that plaintiffs are not entitled to do so, because they had not held the timber more than six months before they disposed of it, which is a necessary requirement of both section 117(a) and section 117(k) (2). Since we think the transaction comes within the terms of section 117(k) (2), we need not discuss the applicability of section 117(a).

Section 117(k) (2) of the Internal Revenue Code of 1939 reads:

"In the case of the disposal of timber * * * held for more than 6 months prior to such disposal, by the owner thereof under any form or type of contract by virtue of which the owner retains an economic interest in such timber * * * the difference between the amount received for such timber * * * and the adjusted depletion basis thereof shall be considered as though it were a gain or loss, as the case may be, upon the sale of such timber * * *."

In order to qualify under this section for capital gains treatment of income arising from a disposition of timber: 1. the taxpayer must be an "owner" of the timber; 2. he must make a "disposal" of it under a contractual arrangement by which he retains an economic interest in it; and 3. the taxayer must have held the timber for more than six months prior to the disposal. Plaintiffs say the transactions in this case meet all three requirements; defendant says they meet none of them. We shall discuss them in order.

1. *Were plaintiffs the owners of the timber?* The advertisement of the Indian Service, acting on behalf of certain Indian Tribes, solicited bids "for the purchase of merchantable timber" on the Simnasho Logging Unit. Dahl bid for the purchase of the timber. The contract, denominated a "Timber Sales Contract," provided that the Confederated Tribes of the Warm Springs Reservation "agree to sell" and the "purchaser agrees to buy * * * all merchantable dead timber * * * and all merchantable live timber" marked for logging by officials of the Indian Service. It provided that *all the timber* would be cut by April 1, 1960, and paid for, and that, during the course of performance, a minimum of 10 million board feet of timber per year would be cut and paid for. The price to be paid for the several varieties was specified, but, since the term of the contract was about 11 years, it was subject to adjustment, up or down, if the market changed from time to time by a stated amount. The sum of $35,000 was required to be deposited as an advance payment for the timber to be cut, and it was agreed that further advance payments would be made as the cutting progressed and in advance of it. The rates prescribed, in paragraphs 8 and 9 of the contract, were "stumpage" rates based upon the "stumpage value of the timber." Stumpage rates are payments for standing timber. Guistina v. United States, 190 F.Supp. 303, 313 (D.Or.1960), aff'd 313 F.2d 710 (9th Cir. 1963). Plaintiffs bought the standing timber, not the logs after they had been cut. Plaintiffs were not only obligated to cut 10 million board feet a year but they were also obligated to pay for 10 million board feet a year. They were obligated to cut all the timber by 1960 and to pay for all of it by that time. They did not buy only such timber as they cut; they bought all the merchantable timber on the tract.

Under this contract Dahl did not acquire legal title to the timber on unallotted lands but he did acquire beneficial ownership of all the timber on the tract. Only he and his associates had the right to reduce the timber to possession and to sell it to whomever they pleased. They had the right to do so against all the world, including the United States and the Indians. Not only did they have the right to cut the timber, they were obligated to do so, and could have been forced to do so and could have been forced to pay for it. They bought not an undetermined part of the timber on the tract, depending on how much they cut, but all of it, for their contract required them to cut 10 million board feet each year, and the entire tract by April 1, 1960.

It was only Dahl and his associates that had the right to exercise *dominion and control* over the timber. This we think made them "owners" of all the merchantable timber on the tract, as that word is used in section 117(k)(2) of the Internal Revenue Code of 1939. The right in the Indian Service to designate the trees to be cut did not limit the amount purchased or circumscribe the obligation to cut; this right was reserved only for the purpose of determining what timber was merchantable. All that was merchantable was sold to plaintiffs and purchased by them.

It matters not that legal title did not pass to the purchasers when the contract was signed; beneficial ownership, good against all the world, did pass, and this is sufficient, we think, to make the "owners" of the timber within the intent of section 117(k)(2) of the Internal Revenue Code. Legal title was retained by

the vendors only as security for future payments of the purchase price.

We think this view is in accord with that of the Supreme Court of Oregon, as expressed in the opinion in Paullus v. Yarbrough, 219 Or. 611, 347 P.2d 620, 79 A.L.R.2d 1222 (1959). The contract in that case was similar to the one before us except that no deposit was made to guarantee the payments agreed upon. The court held that, whether legal title passed or not, equitable or beneficial ownership did pass.

The contract in Wilson v. Commissioner, 26 T.C. 474 (1956), was substantially the same as that in Paullus v. Yarbrough, supra, except that in Wilson a deposit of $5,000 was required, as in this case, and the vendees were also required to pay the taxes. (The payment of taxes was not required in the case at bar because the lands belonged to the United States and hence no taxes were payable.) The Tax Court held that the sellers of the timber were conditional vendors and that, while they retained the legal title, the other contracting party became conditional vendees and, hence, the owners in equity and, as such, "owners" within the meaning of section 117(k) (2) of the Internal Revenue Code of 1939. To the same effect is Hitchcock v. Frank, 63-1 U.S.Tax Cas. 9497, 11 Am.Fed.Tax R.2d 1703 (D.Wash.1963).

The Tax Court relied upon the decision of the Supreme Court of Oregon in Paullus v. Yarbrough, supra, as establishing property rights in such cases. The defendant questions whether state law is controlling in a case where the United States is one of the contracting parties; but the District Court in Guistina v. United States, supra, was of the opinion that, whether state law or federal law was applicable, the result was the same. It was there held that the purchaser became the "owner" of the timber within the meaning of that word as used in section 117(k) (2). The Court of Appeals

agreed. The opinion of the Court of Appeals is particularly applicable to the facts of this case.

In an earlier case (Jantzer v. Commissioner, 284 F.2d 348 (9th Cir. 1960)), the same circuit had reviewed a decision of the Tax Court which had reached a result contrary to the Wilson decision, but we think the facts in the two cases are different. In the Jantzer case the Tax Court pointed out these differences. It said that in Wilson (as in the case at bar), all the timber had to be cut by a definite time, whereas there was no such time limit in Jantzer. Also, taxes in Wilson were paid by the purchaser, but by the seller in Jantzer (a distinguishing factor that has no bearing upon the instant case, for the reason above stated). Again, the contract in Jantzer was assignable only with the consent of the seller.[1] There was no such restriction in Wilson. In view of these differences in the facts of the two cases, the Tax Court in Jantzer held that petitioners were not the owners. The Court of Appeals was troubled about the decision of the Tax Court, but it affirmed it, because it was not "clearly erroneous."

The Court of Appeals in the later case of Guistina v. Commissioner, supra, evidently did not think its opinion was contrary to its former opinion in the Jantzer case, nor do we. In its opinion in the later case it took the same position we take, on facts substantially the same.

Defendant says that if plaintiffs became the owners of the timber, the Government would have required that they carry insurance on it. It might or it might not have. Plaintiffs were financially responsible, they had deposited a bond to secure performance of their contract and the Government probably thought this sufficient.

█ It is not clear what was intended by section 14 of the contract. That section provides that plaintiffs will pay for fire damage to the young growth

---

1. In the case at bar, plaintiffs could assign the contract, but an assignment of it did not relieve them of liability on it, unless the sellers consented.

(which they did not buy) and to "all timber 10 inches and larger in diameter at 4½ feet from the ground and to any other property of the Indians or the Government." Plaintiffs bought only Ponderosa pine and Douglas fir. Whether this clause referred to other trees or to them and the Ponderosa pine and Douglas fir as well, we do not know. Ordinarily, of course, the owner of the timber would have to stand loss from fire, but it is not necessarily inconsistent with the position that plaintiffs had purchased all the timber, that the seller should agree to relieve them of their bargain as to trees destroyed by fire not due to their negligence. At any rate, this clause is not sufficient to counter-balance the other indicia of ownership set out above.

The same, or a similar, provision was in the contract in the Guistina case, but the court held, notwithstanding, that there had been a sale of the timber.

On the whole, we hold that plaintiffs in the case at bar became the "owners" of the timber, as that word was used in section 117(k) (2).

■ 2. *Did plaintiffs make a "disposal" of timber under a form of contract by which they retained an economic interest in the timber?* Plaintiffs' alleged disposition of the timber was to Dahl Pine, Inc., their wholly-owned corporation. Defendant admits that there was a valid sale from plaintiffs to Dahl Pine from which plaintiffs derived gain, but it says it is taxable as ordinary income, and not as capital gain, because what plaintiffs disposed of was not the timber they had acquired but the cut logs, when and as they were delivered to the sawmill. To come within section 117(k) (2), the disposal must have been of the standing timber rather than the cut logs. See Ray v. Commissioner, 32 T.C. 1244 (1959), aff'd 283 F.2d 337 (5th Cir. 1960).

The logging work was done neither by the plaintiffs nor by the corporation but by Barclay Logging Company, which felled the trees, bucked them (i. e., converted them into logs), and moved them to the mill. The question is, whose trees was Barclay Logging Company cutting, plaintiffs' or Dahl Pine's? To put the question another way: was the partnership acting as agent of the plaintiffs or of the corporation?

Regrettably, plaintiffs had no written contract with Dahl Pine. As the trial commissioner says, the parties were dealing with themselves, as individuals on the one hand, as partners in the Barclay Logging Company on another, and as officers of the corporation on another. In such a situation, the commissioner says, oral understandings are not uncommon in the timber industry (finding 28). One thing seems fairly evident, as plaintiff Dahl admitted on the witness stand: Dahl Pine, Inc., was organized for the purpose of securing capital-gains treatment of the income derived from this venture, and this could be done only by a transfer to the corporation of plaintiffs' rights of ownership in the timber under their contract with the Indian Service. We must read the commissioner's finding 26 in the light of this fact. This finding reads:

"When Dahl and Barclay organized the Dahl Pine, Inc. corporation, it was their understanding that Barclay Logging Company would cut the timber required by the contract, that Dahl Pine, Inc. would mill and sell this timber, that Dahl Pine, Inc. periodically would pay Dahl and Barclay as individuals the fair market value as determined by them of the timber cut [at stumpage rates], and that Dahl and Barclay in turn would make the payments to the Bureau of Indian Affairs required under the contract. There was nothing put in writing either contemporaneously or at any time subsequently which spelled out definitively the details of the various obligations assumed by Barclay and Dahl as individuals, or by Barclay and Dahl as partners doing business under the name of the Barclay Logging Company, or by the Dahl Pine, Inc. corporation, of which Barclay and Dahl were the sole own-

ers, incident to the carrying out of such understanding."

In finding 31 the commissioner also says that separate books were kept for the individuals, for the corporation, and for the partnership, and that Dahl Pine paid the individuals for "the timber that was cut * * * as it was cut." This means they paid the stumpage rates for the standing timber. No exception is taken to either of these findings by either party.

The evidence also shows that Barclay Logging Company was paid for its services by the corporation, Dahl Pine, Inc., which, as stated, maintained separate books and a separate bank account from both the Logging Company's and the plaintiffs'. Since the partnership was paid by the corporation, it must have cut down the trees as agent of the corporation.

While the corporation did not pay for the timber until it was cut, nevertheless it bought all the timber on the entire tract, because finding 26 says that it was the "understanding that Barclay Logging Co. would cut the timber required by the contract," that is, 10 million board feet a year and the entire tract by April 1, 1960, and that the corporation would mill it and sell it. The corporation, therefore, agreed to mill and sell all the timber on the entire tract.

We must confess that where the same persons are dealing with themselves in different capacities, it is quite difficult to determine which costume they were wearing when they did this thing or that thing; but, as we have stated, defendant makes no point of the fact that plaintiffs were dealing with themselves. This being so and in view of the purpose for which the corporation was formed, it must be held that the individuals disposed of their rights of ownership in the timber to the corporation.

While there was no written contract in this case and the dealings between the individuals and the partnership and the corporation were most informal, it must be remembered that the statute speaks of a disposal "by any form or type of contract." This language covers just about every means by which people come to an understanding with one another. It could cover the lift of a finger or the winking of an eye or the nod of the head at an auction sale—any means by which people come to an agreement with one another. There is more than one troublesome feature to this case, but this is not one of them. Dahl Pine, Inc., was obligated to accept and pay for whatever Barclay Logging delivered to it, and the Logging Company was obligated to cut and deliver all the specified timber on the tract. In this vital respect this case and the Jantzer case, supra, differ in their facts. See Ray v. Commissioner, supra; Timber Conservation Co. v. United States, 208 F.Supp. 626 (D.Or.1962).

In their understanding with the corporation, plaintiffs, of course, retained an economic interest in the timber. The commissioner has found that the corporation agreed to mill and sell the timber as cut by the Barclay Logging Company and to pay the fair market value of it to the plaintiffs, who would in turn pay the Indian Service the price they were obligated to pay under their contract. This was done. Dahl and Barclay looked to the corporation as the source of the wherewithal with which to meet their contractual obligations. It is manifest that they retained an economic interest in the timber disposed of. This arrangement, as the Tax Court has said, is "[t]he most common instance of [a] disposal of timber with an economic interest retained * * *" Ray v. Commissioner, supra, 32 T.C. at 1250. We so held in Union Bag-Camp Paper Corp. v. United States, Ct.Cl. No. 368–58, decided December 13, 1963, 325 F.2d 730.

The situation here is unlike the facts in Boeing v. United States, 121 Ct.Cl. 9, 98 F.Supp. 581 (1951), where the owner did not come within section 117(k) (2) because he had made an outright lump-sum sale of the timber.

For these reasons, we hold that plaintiffs made a disposal of timber by a form or type of contract by virtue of which they retained an economic interest in the timber.

■ 3. *Did plaintiffs hold their timber for more than six months prior to the disposal?* In order to qualify their transactions for capital-gains treatment under section 117(k) (2), plaintiffs must have owned the timber for a period of six months prior to the date they disposed of it. Defendant contends that the date of the disposal was October 25, 1949, when the first meeting of the shareholders of Dahl Pine, Inc., was held. On that date, plaintiffs put into effect their arrangement to dispose of their timber to the corporation. In this, defendant is clearly correct, although the actual cutting and milling of the timber acquired under the contract did not take place until a later date. Springfield Plywood Corp. v. Commissioner, 15 T.C. 697 (1950); 3B Mertens' Law of Federal Income Taxation 548 (Zimet & Weiss rev. 1958).

The critical issue, therefore, is the date of acquisition of ownership of the timber. Was it acquired by one or both of the plaintiffs on or before April 25, 1949? We will deal with each plaintiff separately, considering, first, when their rights in the timber on so-called unallotted lands were acquired and, second, when their rights of ownership of timber on lands that had been allotted to individual tribal members were acquired.

a. *Philip Dahl.*—In response to the Interior Department's advertisement, Dahl on January 17, 1949, submitted his bid and made a deposit of $35,000 and in all other respects complied with the terms of the advertisement. The evidence indicates that, at that time, he was in all respects an acceptable bidder and the officials of the local Indian Agency so regarded him. His bid was the

highest—indeed the only one submitted. The regulations of the Interior Department, which are authorized by the statute permitting the sale of timber on unallotted lands,[2] provided, in part:

"*Acceptance and rejection of bids.* In ordinary circumstances the high bid received in connection with any advertisement issued under authority of this part shall be accepted. However, the officer authorized to approve the contract shall have the right to reject the high bid and readvertise if he considers the high bidder to be unqualified to fulfill the contractual requirements of the advertisements." 25 C.F.R. § 61.16 (1949).

■ Under this regulation, which in the circumstances, had the force of law (Cf. G. L. Christian & Associates v. United States, Ct.Cl. No. 56–59, decided January 11, 1963, 312 F.2d 418), Dahl's bid could have been rejected only upon the ground that he was "unqualified to fulfill the contractual requirements." Since he was experienced in the lumbering business and had a one-half interest in a partnership with the men, money, and equipment to perform the logging, and was financially and otherwise responsible, his bid could not have been rejected because he was "unqualified to fulfill the contractual requirements." His bid was, in fact, accepted, in accordance with its terms, on January 31, 1949, by a telegram from William E. Warne, an Assistant Secretary of the Interior Department. The necessary authorization to enter into the contract was given by the Tribal Council on February 8, 1949.[3] We think that Dahl's holding period began to run on that date, prior to April 25, 1949.

The advertisement stated that the contract to be entered into could be obtained from "The Superintendent, Warm Springs Indian Agency, Warm

---

2. Section 7 of the Act of June 25, 1910, 36 Stat. 855, 857, 25 U.S.C. § 407 (1958).

3. Section 61.13 of the General Forest Regulations, 25 C.F.R. 62 (1949), made such approval a prerequisite to the sale of timber on unallotted lands.

Springs, Oregon." Therefore, the terms of the contract were known to defendant and, at least constructively, to plaintiffs. Not only this, but the testimony shows that copies of the contract had been circulated among dealers in timber in this region, including plaintiffs, who the testimony shows, had actually seen it. Dahl, therefore, must be held to have put in his bid with the provisions of the contract in mind. It must, therefore, be held that on the date plaintiffs put in their bid, the minds of the parties met. After the date their bid was accepted by the Department and the Tribal Council, both parties were contractually bound to do business with one another on the terms set out in the contract. Nothing in the advertisement for bids postponed the effective date of the sale beyond that time. If after February 8, the Government had refused to conclude the formal contract and to permit the cutting and sale of timber on unallotted lands within the Simnasho Unit, it would have been liable to Dahl, and its liability would have extended, not merely to payment of his expenses up to that time, but to the profit he would have made on the sale of the timber. United States v. Purcell Envelope Co., 249 U.S. 313, 39 S.Ct. 300, 63 L.Ed. 620 (1919), affirming 51 Ct.Cl. 211 (1916). The actual execution and approval of the formal document "was not essential to the consummation of the contract." United States v. Purcell Envelope Co., supra, 249 U.S. at 319, 39 S.Ct. at 302.

Defendant argues that Dahl's period could not have commenced before the date the contract was formally approved by Assistant Secretary Warne on behalf of the Secretary of the Interior, on May 2, 1949, or, at the earliest, on April 28, 1949, the date of the letter of transmittal of the approved contract to the Warm Springs Indian Agency, because paragraph 19 of the contract recited:

"IT IS FURTHER UNDERSTOOD AND AGREED that this contract shall be null and void and of no effect until approved by the Secretary of the Interior * * *."

This clause of the contract, however, can have no application to a case where the bid is accepted by the same Assistant Secretary who signed the formal contract. This clause was a standard one, directed to a situation in which the bid was approved by a subordinate official without authority to execute the formal contract.

Nor does the regulation of the Department of the Interior requiring that no timber of a stumpage value of $100,000 or more be sold without the approval of the Secretary (25 C.F.R. § 61.20 (1949)) prohibit approval in advance of the formal signing, as was done in this case. It is evident that the purpose of the Interior Department's regulation was to insure that contracts involving large sums and great quantities of timber could not be made without the consent of officials at the highest level; these officials had to satisfy themselves that, in the disposition of these valuable assets, there would be no overreaching of or fraud upon the Department's Indian wards and that the prospective purchaser was capable of fulfilling his contractual obligations. But here the telegram which accepted Dahl's bid was sent by the same Assistant Secretary who was authorized to and who ultimately did approve and execute the formal contract on the Secretary's behalf. When the Assistant Secretary gave his approval to Dahl's bid, all of the necessary elements of the contract—the price to be paid, the quantity of timber to be sold, the time permitted for performance, and the financial character of the purchaser—were placed before the appropriate official at the Secretarial level, and he consented to them. After that official acted and the Indian Council gave its consent, there was nothing more to be approved. To say that no contract came into existence until he signed the formal document would exalt form over substance and make a nullity of the Purcell Envelope doctrine.

858

We therefore conclude that the terms of paragraph 19 and the regulation requiring Secretarial approval were complied with when the Assistant Secretary of the Interior, who was authorized to approve the contract, accepted Dahl's bid and the Tribal Council authorized the contract. Our view is in accord with the holdings of the United States District Court for Oregon in Hitchcock v. Frank, supra, and Guistina v. United States, supra.

Dahl must, therefore, be regarded as having held the timber on unallotted lands for a period of more than six months.

b. *Harold Barclay.*—The taxpayers say that Barclay's holding period was coextensive with Dahl's. Defendant contends that, if Barclay ever became an owner of the timber on this land, he acquired his one-half interest therein at a much later date than Dahl did. As evidence of this, defendant points to the fact that Dahl submitted his bid in his name alone upon a "proposal" form supplied by the Indian Bureau, which read, in part, as follows:

"If the proposal is made by individuals, acting neither as a firm nor as a corporation, each must sign.

"If the proposal is made by a copartnership, the signature must consist of the name of the firm followed by the signature of each of the members of the firm."

Dahl alone signed the form. He submitted a cash deposit out of his own funds. He did not make a formal written assignment of half of his interest in the contract to Barclay until October 25, 1949, at which time Barclay paid him one-half of the advance purchase deposits that he had expended as of that date. Dahl's 1949 income tax return reported a sale to Barclay on October 25, 1949, of a half interest in the contract.

Defendant derives from these formal indicia the conclusion that Barclay's ownership did not commence prior to the date of the formal assignment, the same day the disposal of the timber was made. Until that day arrived, defendant says, Barclay had, at most, only Dahl's agreement to assign a half interest in the contract to him at some indefinite future time.

But this is not the end of the matter. It is a familiar axiom of tax law that the wording of formal instruments is not always determinative of the tax consequences of the transactions of which they are a part. Although Dahl signed the bid as an individual, was he, in fact, acting both for himself and for Barclay? Were they, in fact, joint venturers acting jointly, with joint contributions of funds and labor, throughout their course of dealing with the Indian Service? The issue is a factual one, and we must look to all of the circumstances to find the answer. Cf. Commissioner v. Culbertson, 337 U.S. 733, 69 S.Ct. 1210, 93 L.Ed. 1659 (1949).

Since the question is essentially factual, we must rely quite heavily upon the findings of the trial commissioner, to which neither party takes exception. He has found that, from the outset, the plaintiffs intended to embark on the venture as partners and to share equally in any profit resulting from it. It was Barclay who hired and paid the timber evaluation expert who surveyed the logging unit to determine its profitability. This expert reported his findings to Barclay, and Barclay passed them along to Dahl. Both Barclay and Dahl participated in the surveying expedition. They jointly decided to submit a bid. Both men went to the Indian Office to submit it. The Indian Service officials who participated in the transaction at this stage apparently had full knowledge of Barclay's interest in the purchase. Thereafter, the Barclay Logging Company, a partnership in which Barclay was a half owner, began constructing a sawmill to process the timber contracted for. As of October 25, 1949, the partnership had expended a total of $155,000 in constructing it. This was charged equally to the capital accounts of Dahl and Barclay on the books of the Barclay Logging Company.

Thus, it appears that as of the date when the formal written assignment was made, Barclay had not only contributed a personal effort, but also his business judgment and more than $75,000. Quite clearly, he was interested in the enterprise equally with Dahl. That he had not paid his share of the cash expenditure at the time the bid was made is inconsequential in view of the large investment of his funds in the sawmill.

What, then, shall be made of the language of the formal written assignment, which speaks in terms of a present transfer of an interest in the contract: "the undersigned [Dahl] hereby sells, assigns, transfers and sets over unto Harold Barclay an undivided one-half interest in and to said contract * * *" A sufficient answer is found in the findings of the trial commissioner with respect to this document. It did not, he has found, intend a present assignment as of the date it was executed. Rather, its purpose "was to put in writing the previous oral understanding of the parties concerning Barclay's sharing in the profits arising from the disposition of the timber itself as well as from the logging operation." (Finding 25 (d).) In the absence of exception to this finding, it must be taken as true.

We, therefore, conclude that the assignment was merely the formal evidence of a pre-existing relationship, a relationship which existed as a joint venture from the outset, as the commissioner has found.

It therefore follows that Barclay's holding period began at the same time as Dahl's, and that, as to the timber on unallotted land, Barclay has satisfied the six months' holding period requirement.

c. *Timber on allotted lands.*—A distinction must be drawn between the lands which were held in trust for individual allottees and those which were administered for the benefit of all Indians who resided on the Warm Springs Reservation. This distinction is the result of the differing statutory treatment given the sale of the timber located on each type of real estate. As to unallotted lands, section 7 of the Act of June 25, 1910 (36 Stat. 855, 857, 25 U.S.C. § 407 (1958)), permits the Secretary of the Interior to sell all "[t]he mature living and dead and down timber" thereon under such regulations as he may prescribe. As to this timber, the Secretary was permitted to and, as we have held, did make a sale of it to plaintiffs without any further formality.[4]

The statutory provisions with respect to timber on allotted acreage are, however, significantly different. As to this timber, section 8 of the Act of June 25, 1910 (25 U.S.C. § 406), supra, provides:

"The timber on any Indian allotment held under a trust or other patent containing restrictions on alienations may be sold by the allottee, with the consent of the Secretary of the Interior * * *."

We see, therefore, that the Secretary had no statutory authority to sell the timber that stood on allotments; his office was merely to approve or disapprove of such sales as the allottees might make. Only the allottee could transfer the ownership of the timber on his land.

While both the advertisement for bids and the contract that plaintiffs signed warned that approval of the individual allottee was required with respect to timber on allotted property, the officials of the Indian Service, during the preliminary survey and when selecting trees for cutting made no distinction between the allotted and unallotted timber. Nevertheless, if the Government had no right to dispose of the allotted timber—indeed was statutorily prohibited from disposing of it—then its acts were of no effect until the various allottees agreed to sell it. A contract with

---

4. Except, of course, for the approval of the Tribal Council, which was required by the General Forest Regulations that the Department promulgated. See footnote 3, supra.

the Government confers no enforceable rights unless the officer who purported to bind the United States had statutory authority, express or implied, to do so. Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); The Floyd Acceptance Cases, 74 U.S. (7 Wall. 666, 19 L.Ed. 169 (1868), affirming 1 Ct.Cl. 270 (1865). Nor can the failure to make a distinction between allotted lands and unallotted lands in selecting trees for cutting be construed as evidence of an intention to include the timber on allotted lands within the contract formally executed on May 2, 1949, in view of the express terms of the advertisement for bids and of the contract.

■ The evidence shows that plaintiffs obtained the right to cut timber on allotted lands by signing a separate contract pertaining to each individual allotment with the Superintendent of the Warm Springs Agency, who had first obtained a power of attorney from each of the allottees. The contract form spoke in terms of a present sale of timber—effective on the date of its execution. The first such contract was signed on October 10, 1949. Between that date and November 28, 1949, 55 such contracts were signed. Thirty-five more were made on June 14, 1950; and an additional 43 were executed on June 11, 1952. The last contract was signed on April 8, 1953.

It therefore appears that none of the contracts concerning timber on allotted lands was effective more than six months prior to plaintiffs' disposal of that timber. Accordingly, plaintiffs have not satisfied the six months' holding period required under section 117(k) (2), as to this timber. They are not entitled to capital-gains treatment of the income

that they derived from the disposal of timber that stood on allotted lands.

■ Plaintiffs argue that the agreement of the allottees to sell their timber was a practical certainty at the time when the contract for the sale of timber on unallotted lands was made. The trees on the Simnasho Unit were all heavily infested with beetles, and, since the Interior Department would not approve a sale of the allotted timber to anyone except plaintiffs during the then-current 25–30 year cutting cycle, failure of the allottees to agree to sign up with plaintiffs would have cost them the loss of the valuable asset that their timber holdings represented. The fact remains, however, that any allottee could have refused to make such a contract, and, if this had been done, plaintiffs could not have become the owners of or disposed of the timber of any dissident Indian. The fact that the Indian's refusal to sell his timber would have amounted to an act of commercial insanity does not alter the picture; his agreement remained a prequisite to any ownership vesting in plaintiffs.

We conclude that, under section 117 (k) (2) of the Internal Revenue Code of 1939, these taxpayers are entitled to treat as long-term capital gains their income from the disposal of timber that stood on unallotted lands. We also hold that their income from the disposal of timber cut from allotted parcels must, under section 117(k) (2) of the 1939 Code, be regarded as ordinary income. To the extent of this income, defendant's deficiency assessment was correct.[5]

The case is remanded to the trial commissioner in accordance with Rule 47(c) for further proceedings to determine the amount the respective taxpayers are entitled to recover.

5. The parties have also stipulated that the tax treatment of income from the disposal of timber on certain tracts outside of the Simnasho Unit shall be governed by the outcome of this case. Since that timber was also acquired after April 25, 1949, plaintiffs did not hold it for six months prior to its disposition and are not entitled to capital-gains treatment of the revenue it produced.