**GLYNN LAND COMPANY, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

Civ. A. No. 284–05.

United States District Court,
S.D. Georgia,
Brunswick Division.

Feb. 12, 1985.

Randolph W. Thrower, William H. Bradley, Atlanta, Ga., Ralph T. Skelton, Jr., Brunswick, Ga., for plaintiff.

Elizabeth Sullivan, Trial Atty., Tax Div., Dept. of Justice, Washington, D.C., Lawrence Lee, Asst. U.S. Atty., Savannah, Ga., for defendant.

## ORDER

ALAIMO, Chief Judge.

Taxpayer Glynn Land Company ("Glynn") seeks a refund of taxes allegedly overpaid the United States as a result of the mischaracterization of certain income to Glynn as ordinary income rather than capital gain. The dispute requires the Court to construe § 631(b) of the Internal Revenue Code, 26 U.S.C. § 631(b) (1982), which provides capital gain treatment under certain circumstances for profit from the sale of timber. The parties have cross-moved for summary judgment. Having considered the parties' briefs and had the benefit of oral argument on the motions,

the Court concludes that Glynn was entitled to report the disputed income as capital gain under § 631(b). Accordingly, the Court shall grant plaintiff's motion.

## FACTS

The facts of this case are not in dispute. The Court's factual summary is an abbreviation of the Stipulated Statement of Material Facts which the parties submitted on November 29, 1984 (cited hereinafter as "Stipulation"). On July 13, 1964, a timber-cutting contract was closed between land-owner Glynn Farms, Inc., and cutter Brunswick Pulp and Paper Company ("Brunswick"). The contract granted Brunswick timber-cutting rights on a 23,-000-acre tract known as "Paulk's Pasture," located in Glynn County, Georgia. In 1980, Glynn Farms transferred the land and the contract to its subsidiary, Glynn Land Company. Brunswick has assigned undivided one-half interests in the contract to Scott Timber Company and Mead Timber Company, but continues to administer the contract for its assignees.

The contract provided that, from its inception until December 31, 1972, Brunswick would cut and remove all merchantable timber then growing on the land which good forest management prescribed. This obligation has been satisfied and receipts from this cutting are not at issue in this case.

The balance of the contract grants Brunswick a series of three-year cutting options. For the three-year period beginning on January 1, 1973, and for each three-year period thereafter until December 31, 2042, Brunswick has and has had the option to contract with Glynn to cut and remove all merchantable timber then growing on the land which good forest management requires be cut. Glynn has no right to cut or to permit another to cut during any period as to which Brunswick has expressly exercised its option. Further, if Glynn fails to notify Brunswick of the exercise date for any option period, only Brunswick and not Glynn may cut during the unnoticed period. However, if,

as to any period, Glynn timely notifies Brunswick of the option exercise date and Brunswick fails to timely exercise its option for the noticed period, Glynn may itself cut or contract with another to cut during that period.

Under the contract, Glynn agrees to employ Brunswick as its forest manager for the contract term. As forest manager, Brunswick's duties include cutting, replanting and recutting the land, ever employing standard forest management practices. Brunswick pays all costs and expenses of forest management, including the cost of seedlings, labor and equipment. As a management fee, Brunswick receives 25% of the agreed price for all timber removed from the land, whether by Brunswick or by another cutter.

The contract provides that the price which Glynn receives for its timber will be negotiated anew at the beginning of each option period for which Brunswick expressly exercises its option to cut.

The timber is paid for, at least in part, out of advance payments which Brunswick makes to Glynn. Brunswick must advance to Glynn $25,000 interest free each quarter-year for the first twenty years of the contract (1963–1982). The advance payment is excused during any quarter when the balance of advances exceeds $500,000 and during any three-year period for which Brunswick does not exercise its option to cut. Interest on the outstanding advances will begin to accrue on January 1, 1988.

Each year that Brunswick cuts, 75% of the agreed price for the timber is applied against the balance of advances for that year.[1] If the advances for a year are less than the price of timber cut, Brunswick must pay Glynn the difference.

Glynn retains title to Paulk's Pasture and retains all of the responsibilities of an owner. It keeps possession and control of the land and has the obligation to police and protect it. It bears all risks of damage to the trees and is charged with insuring the land against calamity. Glynn is liable for all the land's real estate taxes.

Brunswick exercised its right to cut timber for the three-year period beginning January 1, 1979. The income involved in this suit resulted from payments made by Brunswick to Glynn for timber cut during the January, 1979, to December, 1981, option period.

It was during this option that Brunswick began harvesting "aftergrowth"—cordage that was not in existence at the contract's inception in 1964. The volume of merchantable timber on the land was approximately 201,000 cords in 1964; as of January 1, 1980, Brunswick had cut and paid for 227,000 cords of Glynn's timber. The issue before this Court is whether § 631(b) provides capital gain treatment for Glynn's 1980 receipts from sale of aftergrowth.

The Internal Revenue Service ("IRS") first examined the tax consequences of the Glynn-Brunswick contract in an examination of Glynn's 1967–68 taxable years. As this Order will later discuss, to qualify for capital gain treatment under § 631(b), a taxpayer must (1) retain an economic interest in the timber covered by the cutting contract, and (2) have a qualified ownership interest in the timber. The author of a General Counsel Memorandum issued within the IRS in June, 1974, concluded that Glynn had no "ownership" interest in the aftergrowth and, thus, could not report gain from its sale under § 631(b). Yet, in a Technical Advice Memorandum subsequently issued to Glynn, the IRS avoided the ownership question and concluded that Glynn was ineligible for § 631(b) benefits because it had not retained an economic interest in the timber.

Excepting 1980, Glynn consistently has reported profits received under the contract as capital gain under § 631(b). In keeping with Glynn's characterization of receipts, Brunswick and its successors have treated payments to Glynn as expenditures for the acquisition of timber. The IRS has regularly audited the cutters' returns, yet never indicated to them that their pay-

1. The remaining 25% is retained by Brunswick as its management fee.

ments under the contract might have been reported incorrectly.

For tax year 1980, Glynn followed the IRS's directive, filing a return which claimed receipts from sale of aftergrowth as ordinary income. On March 23, 1982, Glynn filed a Form 1120X amended corporate income tax return, in which it reported these receipts as capital gain. Glynn claimed a refund in the amount of $766, resulting from its recharacterization of the 1980 income. The IRS did not act upon Glynn's refund claim within six months, so Glynn filed suit pursuant to this Court's jurisdiction under 26 U.S.C. § 7422 (1982), 28 U.S.C. § 1346 (1982).

# DISCUSSION

## A. *Statutory Construction* ·

■ Plaintiff seeks to report its gain from sale of aftergrowth to Brunswick as capital gain pursuant to 26 U.S.C. § 631(b). Section 631(b) states:

(b) **Disposal of timber with a retained economic interest.**—In the case of the disposal of timber held for more than 1 year before such disposal, by the owner thereof under any form or type of contract by virtue of which such owner retains an economic interest in such timber, the difference between the amount realized from the disposal of such timber and the adjusted depletion basis thereof, shall be considered as though it were a gain or loss, as the case may be, on the sale of such timber. In determining the gross income, the adjusted gross income, or the taxable income of the lessee, the deductions allowable with respect to rents and royalties shall be determined without regard to the provisions of this subsection. The date of disposal of such timber shall be deemed to be the date such timber is cut, but if payment is made to the owner under the contract before such timber is cut the owner may elect to treat the date of such payment as the date of disposal of such timber. For purposes of this subsection, the term "owner" means any person who owns an interest in such

timber, including a sublessor and a holder of a contract to cut timber.

§ 631(b) Internal Revenue Code, 26 U.S.C. § 631(b) (1982). The statute establishes essentially three prerequisites for capital gain benefits:

(1) a disposal of timber held for more than one year before disposal,

(2) by an owner of the timber,

(3) under a contract by virtue of which the owner retained an economic interest in the timber.

An owner selling pursuant to a cutting contract retains an economic interest in the timber where payments to him under the contract are dependent on severance of timber. *See* 26 C.F.R. § 1.611–1(b)(1) (1984). No economic interest is retained where the timber owner receives payments from the cutter, analogous to rent, regardless of the amount of timber cut. *Dyal v. United States*, 342 F.2d 248, 252 (5th Cir.1965) (buyer was required to make nonrefundable annual payments regardless of whether it cut timber; seller held to have retained no economic interest in timber).

The Government does not contend that Glynn's receipts under the contract were independent of Brunswick's severance of timber.[2] Rather, the Government asserts that Glynn failed to qualify as an "owner" of the aftergrowth for the purposes of § 631(b).

The ownership requirement of § 631(b) is discussed in 26 C.F.R. § 1.631–2(e)(2), which states:

(e) **Other rules for application of section.**

(2) The provisions of section 631(b) apply only to an owner of timber. An owner of timber means any person who owns an interest in timber, including a sublessor and a holder of a contract to cut timber. Such owner of timber must have a right to cut timber for sale on his own account or for use in his trade or business in order to own an interest in

---

**2.** As the Government has not denied Glynn § 631 benefits for this reason, the Court considers the Government as having admitted that this requirement is satisfied.

timber within the meaning of section 631(b).

26 C.F.R. § 1.631–2(e) (1984). The Government urges that the "right to cut" requirement stated in this regulation's final sentence applies to anyone who seeks to qualify as an "owner" for purposes of § 631(b), including title holders of timberland such as plaintiff. Because Glynn has never had a right to cut the aftergrowth, the Government contends that Glynn is not its owner for purposes of § 631(b). The taxpayer responds that "such owners" as used in the "right to cut" sentence refers only to contract holders and sublessors, the class of owners described in the phrase immediately preceding the "right to cut" requirement. Glynn asserts that, as an actual owner of the aftergrowth rather than a mere contractor, it need not have had a right to cut the aftergrowth to be considered its owner for purposes of § 631(b).

The statutory language of § 631(b), which refers merely to "owners" plainly favors plaintiff's assertions. The potential for diverse constructions arises from an ambiguity in Reg. § 1.631–2(e)(2). The narrow task of this Court is to decide whether the "right to cut" requirement of Reg. § 1.631–2(e)(2) applies to all would-be owners or only to sublessors and contract holders. The Court is persuaded by a variety of considerations that the ambiguity should be resolved in favor of the construction proposed by the taxpayer, Glynn.

### (1) *Legislative History and Statutory Context*

■ As the Supreme Court has counseled, in construing an unclear statute, it is the Court's duty "to find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested." *Commissioner v. Engle*, 464 U.S. 206, ——, 104 S.Ct. 597, 604, 78 L.Ed.2d 420, 429 (1984) (citations omitted). The legislative history and statutory context of § 631(b), while not conclusive, support plaintiff's construction of the statute.

### (a) *Legislative History*

■ It has long been established that, under appropriate circumstances, standing timber can qualify as a capital asset and gain from its sale as capital gain. *See Estate of M. Stark*, 45 B.T.A. 882, 887 (1941), *nonacq.*, 1942–1 C.B. 29. With § 631(b), Congress blocked an attempt by the IRS to limit the benefits to timber owners of capital gain reporting.

In the 1941 opinion in *Estate of M. Stark*, the Board of Tax Appeals considered the tax characterization of receipts from timber sold under long-term cutting contracts. From 1917–1938, the purchaser in *Stark*, acting pursuant to a contract, had cut the seller's timber and made monthly payments to the seller for timber cut the preceding month. The IRS denied capital gain benefits for the seller's profit. It took the position that, by having committed his timber to a long-term cutting contract, the owner transformed the timber from property held for investment purposes to property held for sale to customers. The Board rejected the Government's argument and held that the taxpayer's receipts under the cutting contract were reportable as capital gain. 45 B.T.A. at 88. By refusing to acquiesce in the *Stark* decision, the IRS indicated its intention to continue taxing gain received under cutting contracts as ordinary income.

The IRS position on the taxation of cutting contract receipts apparently caused consternation among timber owners. Forestry industry representatives complained to a congressional committee in 1943 that the IRS's position unreasonably preferred the timber owner who sold his timber outright, receiving the entire purchase price at once, over the owner who contracted to sell his timber over time, receiving payment as the timber was cut. *See* Revenue Revision of 1943: Hearings Before the House Comm. on Ways and Means, 78th Cong., 1st Sess., 734. This discriminatory treatment, industry spokespersons asserted, dissuaded forest owners from entering into long-term cutting contracts, even though

sale over time was often preferable to outright sale from the stance of forest management. *Id.*

As one industry representative's statement pointed out:

The outstanding tax problem of the operating forest landowner is the tax treatment of the gain in value which appears when timber is cut. This gain is of two distinct kinds. The first and more important kind is the gain resulting from the physical process by which over the years trees grow in size and volume, at the same time usually improving in quality. The second kind is that resulting over the years from economic changes which cause trees of any given species, age, or quality to become more valuable as measured in dollars.

Supplemental Statement of Forest Industries Committee on Timber Valuation and Taxation, *id.* at 742. The foresters did not suggest that Congress distinguish between these two sources of gain in granting capital gain benefits. Nor did § 117(k)(2),[3] the statute which resulted from the 1943 hearings, indicate that Congress intended to exclude gain from physical growth from capital gain benefits.

The legislative history of § 117(k)(2) reveals that the statute's purpose was to give the timber industry additional flexibility in qualifying timber transactions for capital gain treatment. *Dyalwood v. United States*, 588 F.2d 467, 469 (5th Cir.1979). This purpose is plainly inconsistent with the restrictive construction of the statute which the Government now suggests.

Moreover, the Government's position ignores common sense assumptions regarding Congress' intention in passing § 117(k)(2). The IRS's nonacquiescence in *Stark* put the tax treatment of long-term contracts squarely before Congress. Presumably Congress knew that trees grow, so that the cordage of a stand would increase over the course of a long-term contract.[4] Had Congress intended that the benefits of § 117(k)(2) not extend to gain from sale of aftergrowth certain to be produced over the term of a long-term contract, it would have devised more straightforward language to achieve this result.

#### (b) *Statutory Context*

Section 631(b)'s statutory context further indicates that its capital gain benefits should be accorded sellers of aftergrowth. The Court considers, first, the interplay between § 631(b) and the capital gain provisions at §§ 1221 and 1231 of the IRC. These general statutes provide capital gain treatment for gain from sale under a cutting contract of the timber volume that was standing on the contract date. *See Dyal v. United States, supra,* at 253. Section 631 is superfluous if it provides only what is already available under §§ 1221 and 1231.

The Government insists that § 631(b) does not merely provide benefits which are coextensive with §§ 1221 and 1231. It argues, rather, that this is the peculiar result in plaintiff's case because plaintiff has failed to qualify as an owner of the aftergrowth. The implication is that § 631(b) treatment would be available for receipts from aftergrowth if Glynn had retained a right to cut the aftergrowth. The Government, however, has not shown that Congress sought to select such a contract for special consideration. It has further failed to show that a contract under which the seller retains cutting rights as to aftergrowth would ever exist. It seems unlikely that a cutter would agree to a contract under which he and the seller shared cutting rights as to aftergrowth, or any other portion of the timber.[5] The Court hesitates

---

**3.** Recodified in 1954 as § 631(b).

**4.** Brunswick's records reveal that growth on existing stems in Glynn County averages approximately 15% per year, from the time the sapling begins to grow to age 25, standard harvest age. Affidavit of Edwin L. Douglass, Jr., President of Glynn Land and Glynn Farms, at ¶ 27.

**5.** It is not clear that § 631(b) benefits would even be available to a timber owner who sold aftergrowth pursuant to a nonexclusive cutting contract. *See Joe S. Ray,* 32 T.C. 1244, 1250 (1959), *aff'd,* 283 F.2d 337 (5th Cir.1960) ("analysis of the legislative history and the language of subsection [117](k)(1) and (2) indicates that Congress intended to limit the benefits of sec-

to ascribe to Congress an intent for the statute to have its special effect only in mythical cases.

Turning to § 631(b)'s more immediate setting, § 631(a) provides additional methods for an "owner" to dispose of his timber and report receipts as capital gain. Like § 631(b), § 631(a) considers holders of contract rights to cut as "owners." Interestingly, § 631(a)'s accompanying regulation makes a *clear* distinction, with regard to the "right to cut" requirement between actual owners and holders of contract rights to cut. Under § 631(a), only contract holders, not actual owners, need have had a right to cut to be considered owners. *See* 26 C.F.R. § 1.631–1(b)(1) (1984); *Weyerhaeuser Co. v. United States*, 402 F.2d 620, 626 (9th Cir.1968). As the Court must read § 631(b) in light of its statutory context, the meaning given "owner" in § 631(a) becomes a strong candidate for application under § 631(b). *Contra Schnitzer v. United States*, 69–1 Stand. Fed.Tax Rep. (CCH) ¶ 9160 (D.Ore.1968) (stating that Reg. § 1.631–2(e)(2) "plainly rejects" the distinction between actual owners and contract holders made in Reg. § 1.631–1(b)(1).

**(2) *Rules of Construction***

The legislative history and statutory context of § 631(b) indicate that the right-to-cut requirement should not apply to actual owners. To the extent that doubt remains regarding the meaning of "owner" under the subsection, the Court is inclined to resolve that doubt in the taxpayer's favor. *See Citizens National Bank of Waco v. United States*, 551 F.2d 832, 843, 213 Ct.Cl. 236 (1977) (stating that a taxing statute generally should be construed more strictly against the Government); *cf. Groves v. United States*, 533 F.2d 1376, 1383 (5th

Cir.1976), *cert. denied*, 429 U.S. 1000, 97 S.Ct. 529, 50 L.Ed.2d 611 (1976) (stating that statutes exempting income from taxation are construed strictly against the taxpayer). *See also Masonite Corporation v. Fly*, 194 F.2d 257, 260–61 (5th Cir.1952) ("the literal meaning of the words employed in tax statutes is most important, and the general rule requiring adherence to the letter in construing statutes applies with peculiar strictness to tax laws").

**(3) *Case Law and IRS Enforcement History***

■ The Court's research has revealed only one case adopting the Government's limited construction of § 631(b) "ownership." The taxpayer insists that the dearth of authority shows the novelty of the Government's position; the implication is that in novelty lies error.[6] The Government concedes that the economic interest requirement of § 631(b) is generally the stumbling block for timber owners seeking § 631(b) benefits for contract receipts. However, the IRS insists that the few courts which have considered the issue at bar have found that the right-to-cut requirement applies to contract holders and actual owners alike.

■ To establish the history of its present position, the Government refers the Court to *Carlen v. Commissioner of Internal Revenue*, 20 T.C. 573 (1953), *aff'd*, 220 F.2d 338 (9th Cir.1955), and *Indian Creek Lumber Company v. Commissioner*, T.C.M. 1982–146, 43 T.C.M. (CCH) 841 (1982). The taxpayers seeking § 631(b) benefits in these cases were holders of contract rights to cut, rather than actual owners. Even under plaintiff's construction of § 631(b), such taxpayers would be denied capital gain benefits if they had no

---

tion 117(k)(2) to those transactions where the timber owner surrendered to another his cutting rights to the timber involved, retaining an economic interest usually in the nature of a lease or royalty interest"). Moreover, a nonexclusive cutting contract might be illusory, therefore unenforceable, if it gave a cutter only the right to cut whatever timber the owner did not cut.

**6.** As plaintiff must realize, the IRS is free to change its interpretation of a statute, as long as its interpretation is consistent with that statute. However, the IRS's previous interpretations of a statute are indicative of the statute's proper meaning. *State of Washington v. Commissioner*, 692 F.2d 128, 136 n. 19 (D.C.Cir.1982).

right to cut the timber under contract on their own account.

*Schnitzer v. United States,* 69–1 Stand. Fed.Tax Rep. (CCH) ¶ 9160 (D.Ore.1968), appears to be the sole case in which a court has squarely held that the right-to-cut requirement applies to actual owners. *Schnitzer* involved the tax consequences of a "timber production indenture" between Georgia Mills and the taxpayer, Schnitzer. Under the indenture, the taxpayer acquired title to certain timber owned by Georgia Mills for the price of $2,000,000. The taxpayer borrowed $1,900,000 of the purchase amount from the Bank of America. Contemporaneous with the sale, the taxpayer granted Georgia Mills the right to cut and purchase the timber. Payments from Georgia Mills under the cutting contract were made not to the "owner" but to the Bank of America in payment of the taxpayer's loan. The indenture provided for its own termination when the taxpayer/Bank of America had received from sale of timber to Georgia Mills $2,000,000 plus yearly amounts equal to 6¼% of the unliquidated portion of the principal amount for each year. Upon the indenture's termination, title to any remaining timber would revert to Georgia Mills.

The taxpayer, claiming to own the timber covered by the indenture, reported his gain from its sale as capital gain under § 631(b). The Government responded that the taxpayer was not in fact an owner, but a secured lender, and as such ineligible for § 631(b) benefits. Alternatively, the Government took its present position, arguing that the taxpayer was not an owner for § 631(b) purposes because he at no time had the right to cut the timber. The Oregon district court reasoned that § 631(b) and Reg. § 1.631–2(e)(2) "plainly" require all would-be owners to satisfy the right-to-cut requirement prior to reporting timber income as capital gain. As Schnitzer had never had the right to cut his timber, he was denied the benefit of reporting gain from its sale under § 631(b).

This Court must disagree with the *Schnitzer* court's facile conclusion that

Reg. § 1.631–2(e)(2) "plainly" requires actual owners to have had a right to cut timber before reporting gain from its sale as capital gain. This issue was, moreover, not before the *Schnitzer* court because Schnitzer was not an actual owner of the timber referred to in the timber indenture. Although in form a sale, the transaction in *Schnitzer* was in substance a secured loan from the taxpayer to Georgia Mills. Payments to the taxpayer carried an interest element; title to the "security"—the standing timber—reverted to Georgia Mills upon its repayment of the taxpayer's purchase price. The taxpayer held legal title to the timber as security for his investment, but had no other indicia of ownership. *See Barclay v. United States,* 333 F.2d 847, 852–855, 166 Ct.Cl. 421 (1964) (denying § 117(k)(2) benefits where "owner" held bare title to timber). Unlike the current plaintiff, the taxpayer in *Schnitzer* was not an actual owner but a secured lender. Accordingly, this Court is inclined to give little weight to the *Schnitzer* holding on the application of § 631(b) to owners. *See Commissioner v. Court Holding Co.,* 324 U.S. 331, 332, 65 S.Ct. 707, 89 L.Ed. 981, 982 (1945) ("[t]ax consequences flow from the substance of a transaction, not the form in which it is cast").

The paucity of authority supporting the Government's position may explain the IRS's hesitant pursuit of the ownership issue in this case. An internal General Counsel Memorandum regarding the Glynn contract followed the Government's current theory. G.C.M. 35883, June 28, 1974. Yet, the Technical Advice Memorandum subsequently issued to Glynn ignored the ownership argument and denied benefits for other reasons. Tech.Adv.Memo., August 23, 1974.

The IRS further failed to follow through on its present theory in calculating the cutters' taxes in this case. Consistent with Glynn's characterization of its income as capital gain, Brunswick and its assignees have reported their payments to Glynn as payments for the acquisition of timber. Stipulation at ¶ 18. Under the Govern-

ment's current theory, these payments apparently should have been deducted by the cutters as rental expenses to the extent that the payments were made for purchase of aftergrowth. Although the IRS has regularly audited the cutters' returns, it has never brought this potential error to their attention. Stipulation at ¶ 18. Perhaps the Government has changed its enforcement position with regard to § 631(b). While this is its prerogative, so may this Court assume that the Government's previous understanding of the statute, rather than its current one, is correct.

The Government asks this Court to derive from Reg. § 1.631–2(e)(2) a limitation on the benefits which § 631(b) affords owners of timber. Yet, it offers no persuasive case authority for its restrictive statutory construction. Nor does the legislative history contain any indication that Congress intended to create a more demanding standard for determining ownership under § 631(b) than under § 631(a). To the contrary, the legislative history of § 631(b) bespeaks Congress' desire to provide timber owners with flexibility in qualifying timber transactions for capital gain treatment. The Court would ill-serve this goal if it limited the statute's benefits in a fashion not clearly prescribed by the language of the statute or of its regulations. Accordingly, the Court rejects the Government's argument and holds that actual owners of timber need not satisfy Reg. § 1.631–2(e)(2)'s right-to-cut requirement to report gain from the sale of their timber as capital gain under § 631(b).

### B. Application to the Case at Bar

■ The Court has concluded that Glynn may qualify under § 631(b) as an owner of the aftergrowth on its land without having had a right to cut it. The Court must now consider whether Glynn in fact owned the aftergrowth.[7]

Generally speaking, state law is determinative of property rights, while the manner and extent to which the rights are taxed is controlled by federal law. *Murray v. United States*, 687 F.2d 386, 392 n. 3, 231 Ct.Cl. 481 (1982). Pursuant to this principal, courts have relied on the law of the state in which timber is located in determining whether a taxpayer "owns" the timber for § 631(b) purposes. *See Barclay, supra*, 333 F.2d at 853; *Jantzer v. United States*, 284 F.2d 348, 355 (9th Cir.1960).

■ Glynn held the title to the land covered by the cutting contract both before and after the cutting contract closed. It retains the right to possess and control the land throughout the contract term, subject to Brunswick's cutting rights. Under Georgia law, the owner of land also owns all things permanently attached to it, including standing timber. *See* O.C.G.A. § 44–1–2 (1982). Thus, as Glynn continues to own the land, it continues to own the timber growing upon it.

■ Glynn did not relinquish its legal or beneficial ownership of the timber on its land by granting Brunswick an option to purchase it. *See Mattox v. West*, 194 Ga. 310, 315, 21 S.E.2d 428 (1942) (an option to purchase land does not, before acceptance, vest in the option holder any interest in the land itself). To the contrary, Glynn retains the responsibilities and risks which flow from timber ownership for the contract period. It remains responsible for tax assessments against the land. It bears the risk of damage to the timber and is charged with protecting the land against trespassers. Glynn has seen to the land's productivity by hiring Brunswick as forest manager. In that the price which Glynn receives is renegotiated every option period, Glynn bears the risk of market failure.

Glynn's rights and responsibilities under the Glynn-Brunswick contract are plainly inconsistent with any inference that ownership of standing aftergrowth rests with

---

**7.** This discussion is included for the sake of logical completeness. The Government has limited its argument to the scope of the right-to-cut requirement and does not dispute that Glynn

may claim § 631(b) owner's benefits if the right-to-cut requirement is not applicable to actual owners.

Brunswick. The contract rather provides that Glynn "owns" the timber—original growth and aftergrowth—until it is cut and paid for by Brunswick. As an owner of the aftergrowth, Glynn is entitled to report gain from its sale under I.R.C. § 631(b).

**CONCLUSION**

The Court adopts plaintiff's construction of § 631(b) and finds that plaintiff, as an owner of the aftergrowth, may claim the benefits of § 631(b) for its gain from the aftergrowth's sale to Brunswick. The Court thus GRANTS plaintiff's motion for summary judgment against the Government in the amount of $766, the amount which plaintiff overpaid in taxes. The Clerk of Court is directed to enter judgment consistent with this Order.